UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTOPHER D. BELL, | ) | Case No. 1:09CV1887 |
| | ) | |
| Petitioner, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| v. | ) | Magistrate Judge George J. Limbert |
| | ) | |
| TERRY A. TIBBALS, WARDEN, | ) | **Report and Recommendation** |
| | ) | **of Magistrate Judge** |
| Respondent. | ) | |
| | ) | |

On August 12, 2009, Petitioner Christopher D. Bell ("Petitioner"), through counsel, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254. ECF Dkt. #1. The petition was amended on January 4, 2010. ECF Dkt. #8. Petitioner seeks relief for alleged constitutional violations that occurred during his trial in the Cuyahoga County, Ohio Court of Common Pleas, where he was convicted of one count of murder, in violation of Ohio Revised Code ("O.R.C.") §2903.02 with a firearm specification, one count of attempted murder, in violation of O.R.C. §2923.02/2903.02 with a firearm specification , two counts of receiving stolen property, in violation of O.R.C. §2913.51, with a violence specification, and one count of having a weapon while under disability, in violation of O.R.C. §2923.13. ECF Dkt. #13-2 at 10.[1]

The petition constitutes a second or successive petition, as his original petition, which was filed in 1999[2], was denied as time-barred by this Court. *Bell v. Mitchell*, 1:99CV3166 (N.D.Ohio). The Sixth Circuit Court of Appeals declined to issue a certificate of appealability. See *Bell v. Mitchell*, No. 00-4437. However, on June 16, 2009, the Sixth Circuit Court of Appeals issued an

---

[1]The parties are instructed in future pleadings to cite to the ECF docket number of the cited pleading and the page number assigned to cited pleading by the ECF system, which can be found in the blue print at the top of the page, *i.e.* "1 of 56," or the ECF toolbar.

[2]The undersigned recommends that the Court find that the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this Court's review of the instant case because Petitioner filed his original petition for the writ of habeas corpus and the pending petition after the act's effective date of April 26, 1996.

order, pursuant to 28 U.S.C. 2244(b)(3)(A)[3], granting Petitioner leave to file a second or successive application for a writ of habeas corpus pursuant to 28 U.S.C. §2244.  *In re Bell*, Case No. 08-3831 (6th Cir. June 16, 2009).

The Sixth Circuit determined that Petitioner had made a *prima facie* showing[4] that his claim relies on new evidence of innocence that could not have been discovered earlier, and which if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.  *Id*.  Accordingly, the Sixth Circuit determined that this Court must engage in additional analysis in order to ascertain whether but for the constitutional error, no reasonable factfinder would have found Petitioner guilty of the underlying offenses.  *Id*. at 2-3.          The Court reasoned as follows:

> Essentially, the new evidence Bell cites are 1990 police reports that were withheld from the defense and which Bell was not able to obtain until November 2006. Most significantly, the reports show that a witness to the shooting in this case described the perpetrator's car as a beige or off-white Buick 225, rather than the white Oldsmobile

---

[3]28 U.S.C. 2244(3) reads, in its entirety:

(3)(A) Before a second or successive application permitted by this section is filed in the district court, the applicant shall move in the appropriate court of appeals for an order authorizing the district court to consider the application.

(B) A motion in the court of appeals for an order authorizing the district court to consider a second or successive application shall be determined by a three-judge panel of the court of appeals.

(C) The court of appeals may authorize the filing of a second or successive application only if it determines that the application makes a *prima facie* showing that the application satisfies the requirements of this subsection.

(D) The court of appeals shall grant or deny the authorization to file a second or successive application not later than 30 days after the filing of the motion.

(E) The grant or denial of an authorization by a court of appeals to file a second or successive application shall not be appealable and shall not be the subject of a petition for rehearing or for a writ of *certiorari*.

[4]" 'Prima facie' in this context means simply sufficient allegations of fact together with some documentation that would 'warrant a fuller exploration in the district court.' " *In re Lott*, 366 F.3d 431, 433 (6th Cir.2004).

> Cutlass that Bell drove. In addition, the reports show that police located a parked vehicle matching the description, and that the vehicle contained a baseball hat matching one described by the surviving shooting victim in this case as being worn by the perpetrator. Further, police reports reflect that the murder victim had recently had a conflict with a former girlfriend, and that the former girlfriend may have threatened to order a "hit" on the victim. Although these police reports apparently were withheld from the defense, the defense was aware of both the Buick 225 and the victim's conflict with his ex-girlfriend, and while both subjects were explored to some extent by the defense at trial, the withheld police reports likely would have been of great value to the defense at trial. Under these circumstances, Bell's new evidence warrants further scrutiny in the district court.

*Id.* at 3.

On March 26, 2012, with leave of court, Respondent Terry A. Tibbals, Warden of Mansfield Correctional Institution ("Respondent"), where Petitioner is incarcerated, filed an answer/return of writ. ECF Dkt. #13. On April 9, 2010, Respondent filed an amended answer and motion to dismiss. ECF Dkt. #16. The motion to dismiss was predicated upon Petitioner's alleged failure to timely file the petition. On May 21, 2010, Petitioner filed a response to the amended answer/motion to dismiss, as well as a motion for leave to conduct discovery and for the appointment of an expert. ECF Dkt. ##17-19. With leave of Court, Petitioner filed an amended response to Respondent's amended answer/motion to dismiss on May 26, 2010. ECF Dkt. #20. Respondent filed his reply brief on July 16, 2010. ECF Dkt. #26. On December 17, 2010, Petitioner's motion for appointment of an expert was denied on December 17, 2010, and his motion for leave to conduct discovery was granted in part and denied in part. ECF Dkt. #37, 38. The undersigned limited discovery to a single issue, that is, whether no reasonable juror would have found petitioner guilty beyond a reasonable doubt. ECF Dkt. #38 at 3. The undersigned further observed that the timeliness of the petition should be determined after the gateway issue of actual innocence is resolved. *Id.* at 3-4.

The parties entered into a stipulated discovery schedule. ECF Dkt. #49. After the completion of the limited discovery authorized by the Court, Petitioner filed his Brief in Support of Habeas Relief on July 3, 2012. ECF Dkt. #104. Respondent filed his Brief in Opposition on October 19, 2012. ECF Dkt. #109. Petitioner filed his Reply In Support on November 30, 2012. ECF Dkt. #113.

For the following reasons, the undersigned RECOMMENDS that the Court DISMISS the petition in its entirety with prejudice:

## I.  **SYNOPSIS OF THE FACTS**

The Eighth District Court of Appeals of Ohio set forth the relevant facts on direct appeal. *State v. Bell*, 1993 WL 146599 (Ohio App. 8th Dist.).  These binding factual findings "shall be presumed to be correct," and Petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. §2254(e)(1); *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998), *cert. denied*, 119 S.Ct. 2403 (1999):

> Ronald Green[5] testified that on November 14, 1990, at about one o'clock a.m., he was a passenger in an automobile driven by Vance Triplett.  At the intersection of Shaw Avenue and Hayden Avenue in East Cleveland, Ohio, while they waited at the traffic light, a white Oldsmobile with its bright lights on pulled behind their car. They had passed the white automobile earlier as they turned onto Shaw Avenue.  The car pulled along the passenger side of their automobile.
>
> The driver of the white Oldsmobile, who was later identified as appellant, Christopher Bell, stared at them and then rolled his window down.  Green also rolled his window down.  Bell then said "Y'all niggas got a problem or something."  Green replied, "Do you."  Bell then said, "Yea." and fired at them.  The first shot hit Green in the face and more shots were fired.  The white automobile drove off.  Triplett got out of the car and fell on the grass. The last word Triplett said was "I am tired." Green recognized the driver of the white automobile because the automobile was three feet away from them and there were street lights at the intersection.  Green described the driver of the automobile to the police as a light skinned guy with an Afro curl, wearing a black jacket and a black hat.  He was unable to identify anyone from the first photo array shown to him at the hospital. He identified Bell in a subsequent photo array.
>
> Officer Mark Trzcinski of the East Cleveland Police Department testified that he was the first officer on the scene of the shooting on Shaw Avenue on the morning of November 14, 1990.  When he arrived, Green was conscious and the first words he uttered were "A white Olds Cutlass."  He repeated these words several times. Officer Trzcinski found Triplett lying on the tree lawn in front of 13420 Shaw Avenue.  He appeared to be dead. He found no weapons at the scene.
>
> Officer Jeffery Hall of the East Cleveland Police Department testified that he arrived at the scene of the shooting at about 1:30 a.m. on November 14, 1990.  He recovered eight spent .380 casings at the scene. He observed a Cadillac in front of 13517 Shaw Avenue and Vance Triplett in front of 13420 Shaw Avenue.  He recovered a spent bullet from the passenger side floor board of the Cadillac.
>
> Detective Robert Kalvitz of the East Cleveland Police Department testified that he went to Huron Road Hospital on the morning of November 14, 1990 to interview Ronald Green. Green gave him a description of the man who shot him.

---

[5]The correct spelling of the victim's name is "Greene."

On November 19, 1990 Detective Kalvitz showed Green a photo array and he was unable to identify anyone. On November 28, 1990 Kalvitz showed Green another photo array and he picked out Bell as the man who shot him and Triplett. Kalvitz showed him photographs of a white Cutlass Oldsmobile, a black cap and a black leather jacket. He told Kalvitz that they looked similar to the ones he saw on the morning of the shooting.  On December 4, 1990, Kalvitz showed Green another photo array consisting of five photographs.  Green again picked out Bell as the driver of the white Oldsmobile and the man who shot him and Triplett.

Detective Kalvitz testified he went to 1820 Noble Road, on account of a telephone call to the station by one Monica Harris.  Ms. Harris called the station to report that she had information regarding a suspect in a homicide.  Kalvitz went to the apartment building in the company of another officer to speak to Ms. Harris.  On arrival, they noticed a white Oldsmobile Cutlass in the parking lot of the building. Kalvitz remembered that the automobile involved in the killing of Triplett was similar to the one in the parking lot.  Upon further investigation, he noticed that the steering column did not match.  The license plate was registered to Perron Williamson, while the vehicle identification number matched an automobile reported stolen from Mansfield, Ohio.

Kalvitz testified that Ms. Harris informed them that Bell had indicated to her that he shot two people at the intersection of Hayden Avenue and Shaw Avenue.  Kalvitz showed Ms. Harris a photograph of Bell whom she identified as the man who told her about the shooting. Kalvitz was directed to Ann Edwards' apartment by Ms. Harris.

Kalvitz went to Ann Edwards' apartment.  Ms. Edwards came to meet Kalvitz and the other officers. She identified herself and informed them that Bell was in the apartment.  Bell came out of the apartment and was placed under arrest after his rights were read to him.  Kalvitz testified that when Bell was placed under arrest, he said, "Oh, you're trying to put the shooting from Hayden and Shaw on me."  Kalvitz stated that Bell made the statement before he was informed of any shooting.

Kalvitz testified that Ann Edwards told the police she had information about the Hayden/Shaw shooting. She signed a waiver and consent to the search of her apartment. When asked if there were guns in the house, she brought out a duffle bag belonging to Bell. The bag contained a .12-gauge gun, a loaded .357 automatic, a Reuger revolver, a .380 magazine clip with ten live rounds, a box of shotgun shells, titles to automobiles, a screwdriver and other papers. She gave Kalvitz keys to two automobiles, a black leather jacket and a cap. Kalvitz discovered two welfare identification cards with Bell's picture inside the white Oldsmobile which belonged to Robert Stillwell of Mansfield.

Bell testified only at the suppression hearing. He denied making any statements regarding the shooting at Shaw and Hayden Avenues. He admitted living in the apartment with Ms. Edwards. He has lived there for about six months. He kept some of his possessions in that apartment. At the time of his arrest, he did not have any other address. He admitted owning the white Oldsmobile Cutlass and the Pontiac Trans Am, which were discovered to be stolen vehicles. He admitted ownership of the duffel bag and its contents.

Monica Harris testified at trial that she was at Ms. Edwards' apartment on the night of November 13, 1990 with Bell and Ms. Edwards, drinking. Bell left the apartment sometime after midnight to purchase more beer.  He returned about 60 minutes later

with beer, guns and clothing. He had one shotgun, a revolver, an automatic handgun and two ammunition clips in a plastic bag. According to Ms. Harris, Bell appeared wild as he came into the apartment. He was wearing a black leather jacket and a black Raider's cap with his eyes bugged out real wide and his hair standing.

Bell told them that they would not believe what he had just done. He said, "he just shot two guys on the corner of Shaw and Hayden and he unloaded on them." He emptied one clip, reloaded and shot them, because they were following him.

He went to the store after the shooting. He asked Ms. Harris to keep his guns until he could get rid of them. She returned the guns to Bell after she found out about Triplett's death. Bell informed Ms. Harris that he had gotten rid of the automatic weapon.

She first mentioned the incident to her friend, Detective Patterson. When the officers came to her apartment, she told them that Bell did the shooting. She told them that Bell was in Edwards' apartment. She gave the officers a Florida license plate left in her apartment by Mr. Bell. The Florida license plate and the Pontiac Trans Am were identified by Robert Grossman as his plate and his Pontiac Trans Am, which was stolen on October 17, 1991.

Richard Turbok testified that he is a firearm examiner for the Ohio Bureau of Criminal Identification and Investigation. He examined and compared the eight spent .380 casings recovered from the scene of the shooting and the one .380 found in the Trans Am and another found in the victim's automobile, and concluded all ten cartridge casings were fired from the same weapon. He also compared the casings to the .380 magazine found in the duffel bag and concluded that they are of one similar design and could have been in the magazine.

The four bullets recovered from the body of Triplett and three others recovered at the scene of the shooting were all fired from the same weapon.

A nitrate test was conducted on the Cutlass and gunshot residues were found on the left hand corner of the dashboard with a heavier concentration on the window ledge of the driver's side door.

John Barnes testified that he is the owner of the apartment building located at 1820 Noble Road, in the city of East Cleveland. Apartment Number 5, he testified, was rented to Ann Edwards. Bell did not seek his consent before living with Ann Edwards.  He testified that Bell drove a white Cutlass and a black Trans Am or Camaro.

Sheila Roberts testified that she had known Bell for more than three years. She had seen Bell, during the months of September and November of 1990, drive a white Cutlass. She saw him with a nine millimeter automatic he referred to as his "new toy," in September of 1990. She also identified a photograph of a black Trans Am as being similar to the automobile Bell drove.

Anthony Baylor testified that he saw Bell on the evening of November 13, 1990 at Malaikah Gray's house.  However, Baylor left the house at 11:30 p.m.

Bell's father, Arthur Bey, testified that he saw his son on the evening of November 13, 1990 at his daughter's birthday party.  He left the house at 10:00 p.m. while Bell was still at the party.

-6-

Malaikah Gray testified that Bell was at her house for her birthday party on November 13, 1990. She testified that he slept at her house that night. She admitted that her brother drove a white Cutlass.

*State v. Bell, supra,* *1-4.

## II.  PROCEDURAL HISTORY

### A.  State Trial Court

Petitioner was indicted by the September 1990 Term of the Cuyahoga County, Ohio Grand Jury on one count of Having Weapons While Under Disability in violation of Ohio Revised Code §2923.13, with violence and firearm specifications, one count of Receiving Stolen Property in violation of R.C. §2913.51, with a violence specification, one count of Attempted Murder in violation of R.C. §2923.02/2903.02 with a firearm specification and one count of Aggravated Murder in violation of R.C. §2903.01 with mass murder and firearm specifications. The first two offenses were alleged to have occurred on November 27, 1990 and the latter two, involving two victims, on November 14, 1990. ECF Dkt. #13-2 at 1-4.

Petitioner was later indicted by the January 1991 Term of the Cuyahoga County, Ohio Grand Jury on one count of Receiving Stolen Property in violation of R.C. §2913.51 with violence specifications. This offense was alleged to have occurred between November 1, 1990 and November 26, 1990. ECF Dkt. #13-2 at 6. Both cases were consolidated for trial. Bell waived his right to a jury trial on the Having Weapons While Under Disability Charge only. ECF Dkt. #13-2 at 8. The case proceeded to a jury trial on the remaining charges. Bell moved for acquittal and the court granted acquittal as to the Aggravated Murder charge only, concluding that the State failed to establish prior calculation and design. That charge was reduced from Aggravated Murder to Murder. ECF Dkt. #13-2 at 9. Petitioner was found guilty on all of the charges. On July 24, 1991, Petitioner was sentenced to aggregate terms of eighteen years to Life. ECF Dkt. #13-2 at 10.

### B.  Direct Appeal

Petitioner, through new counsel, filed a timely appeal to the Eighth District Court of Appeals, Cuyahoga County, on August 22, 1991. In his brief, Petitioner presented the following assignments of error:

-7-

1. THE TRIAL COURT ERRED WHEN IT DENIED THE DEFENDANT ACCESS TO POLICE INVESTIGATIVE RECORDS ABOUT PREVIOUS SUSPECTS IN THE CASE IN VIOLATION OF THE "PUBLIC RECORDS ACT". THIS DENIAL PREVENTED THE DEFENDANT FROM PROPERLY PRESENTING A DEFENSE AND AS SUCH WAS A VIOLATION OF DUE PROCESS.

1A. THE DENIAL OF THE RIGHT TO PROPERLY PRESENT A DEFENSE IS VIOLATIVE OF THE DEFENDANT'S DUE PROCESS RIGHTS.

2. THE SEARCH OF THE DEFENDANT'S DUFFEL BAG, WITHOUT A WARRANT AFTER HE HAD BEEN ARRESTED, HANDCUFFED, AND REMOVED FROM THE PREMISES WAS VIOLATIVE OF THE FOURTH AMENDMENT AND WARRANTED SUPPRESSION OF EVIDENCE. IT WAS ERROR FOR THE TRIAL COURT NOT TO DO SO.

3. BECAUSE THE SEARCH OF THE DEFENDANT'S DUFFEL BAG WAS IN VIOLATION OF THE FOURTH AMENDMENT, THE "FRUIT OF THE POISONOUS TREE" DOCTRINE IS APPLICABLE TO EXCLUDE ALL DERIVATIVE EVIDENCE.

4. THE TRIAL COURT'S REFUSAL TO ALLOW THE DEFENSE TO QUESTION A STATE WITNESS AS TO HER USE OF COCAINE TO IMPEACH HER CREDIBILITY WAS ERROR, AND EFFECTIVELY DENIED THE DEFENDANT THE RIGHT TO A FAIR TRIAL.

5. THE PROSECUTOR'S MISCONDUCT DENIED THE DEFENDANT A FAIR TRIAL.

6. THE DEFENDANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL.

(A) THE FAILURE BY DEFENSE COUNSEL TO TAKE EFFORTS TO SECURE THE PRESENCE OF TWO WITNESSES ON BEHALF OF THE DEFENSE WAS INEFFECTIVE AND DENIED THE DEFENDANT A FAIR TRIAL.

(B) THE FAILURE TO ELICIT CRITICAL INFORMATION FROM THE STATE WITNESS DURING THE MOTION TO SUPPRESS PREVENTED THE TRIAL COURT FROM CONSIDERING THE TOTALITY OF THE EVIDENCE NECESSARY FOR THE CONSIDERATION OF THE MOTION, THE ELICITING OF CRITICAL INFORMATION DURING THE TRIAL ONLY WAS INEFFECTIVE AND DENIED THE DEFENDANT A RIGHT TO A FAIR TRIAL.

7. THE WARRANTLESS ARREST OF THE DEFENDANT WAS IN VIOLATION OF THE FOURTH AMENDMENT AND WARRANTS SUPPRESSION OF ANY AND ALL STATEMENTS MADE SUBSEQUENT TO THAT ARREST AND ALL EVIDENCE WHICH WAS DERIVATIVE OF THAT VIOLATION, THE COURT ERRED IN FAILING TO GRANT THAT SUPPRESSION MOTION.

8. THE TRIAL COURT ERRED IN REFUSING DEFENSE COUNSEL'S REQUEST FOR FINDINGS OF FACT AS RELATES TO THE "FRUIT OF THE POISONOUS TREE" RAISED IN THE SUPPRESSION MOTION.

9. THE TRIAL COURT ERRED IN IMPOSING TWO CONSECUTIVE FIREARM SENTENCES.

In a Journal Entry and Opinion issued on May 6, 1993 and journalized on May 17, 1993, the Court of Appeals vacated the sentence for one of the firearm specifications but overruled each other assignment of error and affirmed the judgment of the trial court as modified. *State v. Bell,* 1993 WL 146599 (Ohio App. 8th Dist.).

### C.    Supreme Court of Ohio

The Ohio Supreme Court declined to hear Petitioner's subsequent appeal as it raised no substantial constitutional question. *State v. Bell*, 619 N.E.2d 698 (Ohio 1993) (table).

### D.    State Post-Conviction Petition

In 1996, Petitioner filed a petition for post-conviction relief in the state trial court, raising several claims of ineffective assistance of counsel, which the trial court denied in 1997.  A copy of the petition was not attached to the return of writ.  The Ohio Court of Appeals affirmed on the basis of *res judicata*, finding Bell previously raised the issues on direct appeal.  *State v. Bell*, 1998 WL 598754 (Ohio App. 8 Dist. Sept. 10, 1998). On January 20, 1999, the Ohio Supreme Court declined to hear Petitioner's appeal, finding it raised no substantial constitutional question.  *State v. Bell*, 704 N.E.2d 577 (Ohio 1999) (table).

### E.    Initial Federal Habeas Petition

Bell filed his initial federal petition for a writ of habeas corpus in this Court on December 27, 1999, asserting five claims for relief, which this Court dismissed in 2000 as barred by the statute of limitations. *Bell v. Anderson*, No. 1:99-CV-03166 (N.D. Ohio, dismissed October 11, 2000). The Sixth Circuit denied Petitioner a certificate of appealability and denied a petition for rehearing. See *Bell v. Mitchell*, No. 00-4437 (6th Cir. Apr. 17, 2001) (unpublished); *Bell v. Mitchell*, No. 00-4437 (6th Cir. June 12, 2001) (unpublished).

### F.    State Motion for New Trial

Based largely upon the new evidence that Bell obtained in 2006, which is the subject of this report and recommendation, Bell filed a *pro se* motion for a new trial in the Cuyahoga Court of

Common Pleas on February 28, 2007. ECF Dkt. #13-7. On March 27, 2007, the trial court summarily denied the motion for new trial.  ECF Dkt. 13-8 at 1.  However, neither the State nor the Petitioner was aware that the motion had been dismissed, and both sides continued to brief the issue. See *id.* at 2-24 (State's opposition brief filed March 30, 2007); 25-106 (Petitioner's reply brief filed on May 3, 2007); ECF Dkt. #13-9 at 1 (Petitioner's motion to file supplemental brief filed on November 13, 2007); ECF Dkt. #13-9 at 172 (State's opposition to the motion filed on December 12, 2007.)

Petitioner filed his notice of appeal and motion to file a delayed appeal to the Eighth District Court of Appeals on December 13, 2007.  ECF Dkt. #13-10. Petitioner explained that he learned on December 5, 2007 that the motion for new trial had been dismissed on March 27, 2007, when he looked at the trial court's docket. ECF Dkt. #13-10 at 33 ("On December 5, 2007, defendant/appellant learned of another avenue to receive criminal docket information via the Prison Unit Management Department.") The Ohio Court of Appeals dismissed Bell's appeal on December 20, 2007. *State v. Bell*, No. CA-07-090777 (Ohio App. 8 Dist. Dec. 20, 2007).

Petitioner filed a motion for delayed appeal to the Ohio Supreme Court on March 31, 2008. ECF Dkt. # 13-10 at 49.  On May 21, 2008, the Ohio Supreme Court denied Bell's motion for a delayed appeal.  *State v. Bell*, No. 08-0620  (Ohio June 9, 2008).

### G.     <u>Federal Habeas Petition</u>

Petitioner filed the pending petition on August 12, 2009.  He asserts the following grounds for relief:

GROUND ONE:

CHRISTOPHER BELL IS ENTITLED TO HABEAS RELIEF BECAUSE HE IS ACTUALLY INNOCENT OF MURDER AND ATTEMPTED MURDER. UNITED STATES CONSTITUTIONAL AMENDMENTS V, VIII, XIV.

GROUND TWO:

CHRISTOPHER BELL IS ENTITLED TO HABEAS RELIEF BECAUSE HIS TRIAL ATTORNEYS WERE INEFFECTIVE. U.S. CONSTITUTIONAL AMENDMENTS VI AND XIV.

-10-

GROUND THREE:

CHRISTOPHER BELL IS ENTITLED TO HABEAS RELIEF BECAUSE THE PROSECUTION WITHHELD EXCULPATORY IMPEACHING EVIDENCE.

ECF Dkt. #1.

## III.  PROCEDURAL BARRIERS TO REVIEW

A petitioner must overcome several procedural barriers before a court will review the merits of a petition for a federal writ of habeas corpus.  As Justice O'Connor noted in *Daniels v. United States*, "Procedural barriers, such as statutes of limitations and rules concerning procedural default and exhaustion of remedies, operate to limit access to review on the merits of a constitutional claim."  532 U.S. 374, 381 (2001); *see also United States v. Olano*, 507 U.S. 725, 731 (1993). However, the Supreme Court has also held that it would be in the interests of the parties and the courts for the merits of a petition to be addressed forthwith if it is clear that the applicant does not even raise a colorable federal claim. *Granberry v. Greer*, 481 U.S. 129, 135 (1987); *Prather v. Rees*, 822 F.2d 1418, 1421-22 (6th Cir. 1987) (lack of exhaustion was properly excused where petition was plainly meritless, the state had not addressed exhaustion, and disposition of the case would not offend federal-state comity).

### A.  Statute of Limitations

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") statute of limitations period for filing a petition for a writ of federal habeas corpus is one year, and it begins to run on the date judgement became final.  28 U.S.C. §2244(d)(1). Here, Respondent contends that Petitioner filed the petition after the one-year statute of limitations had run.  Petitioner contends that the statute of limitations should be equitably tolled.  In the alternative, the Sixth Circuit has held that a petitioner who presents a credible claim of actual innocence is entitled to equitable tolling of AEDPA's statute of limitations.  *Souter v. Jones*, 395 F.3d 577, 601 (6th Cir.2005).

### B.  Exhaustion of State Remedies

As a general rule, a state prisoner must exhaust all possible state remedies or have no remaining state remedies before a federal court will review a petition for a writ of habeas corpus.

28 U.S.C. § 2254(b) and (c); *see also Baldwin v. Reese*, 541 U.S. 27, 29 (2004).  The exhaustion requirement is satisfied "once the federal claim has been fairly presented to the state courts." *Franklin v. Rose*, 811 F.2d 322, 325 (6th Cir. 1987).  To exhaust a claim, a petitioner must present it "to the state courts under the same theory in which it is later presented in federal court." *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998); *see also McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000).  General allegations of the denial of rights to a "fair trial" and "due process" do not "fairly present" claims that specific constitutional rights were violated. *McMeans*, 228 F.3d at 681 citing *Petrucelli v. Coombe*, 735 F.2d 684, 688-89 (2d Cir. 1984).

In order to have fairly presented the substance of each of his federal constitutional claims to the state courts, the petitioner must have given the highest court in the state in which he was convicted a full and fair opportunity to rule on his claims.  *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990).  A petitioner fairly presents the substance of his federal constitutional claim to the state courts by: (1) relying upon federal cases that use a constitutional analysis; (2) relying upon state cases using a federal constitutional analysis; (3) phrasing his claim in terms of constitutional law or in terms sufficiently particular to allege the denial of a specific constitutional right; or (4) alleging facts that are obviously within the mainstream of constitutional law. *Clinkscale v. Carter*, 375 F.3d 430, 437 (6th Cir. 2004), quoting *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003); *see also Levine v. Torvik*, 986 F.2d 1506, 1516 (6th Cir. 1993) cert. denied, 509 U.S. 907 (1993)(quotation omitted).  In *Harris v. Lafler*, the Sixth Circuit laid out the options that a district court may pursue in dealing with a petition that contains unexhausted claims:

> When faced with this predicament in the past, we have vacated the order granting the writ and remanded the case to the district court so that it could do one of four things: (1) dismiss the mixed petition in its entirety, *Rhines*, 544 U.S. at 274, 125 S.Ct. 1528; (2) stay the petition and hold it in abeyance while the petitioner returns to state court to raise his unexhausted claims, *id.* at 275, 125 S.Ct. 1528; (3) permit the petitioner to dismiss the unexhausted claims and proceed with the exhausted claims, *id.* at 278, 125 S.Ct. 1528; or (4) ignore the exhaustion requirement altogether and deny the petition on the merits if none of the petitioner's claims has any merit, 28 U.S.C. § 2254(b)(2).

553 F.3d 1028, 1031-32  (6th Cir. 2009).  The Supreme Court has held that "the petitioner has the burden . . . of showing that other available remedies have been exhausted or that circumstances of peculiar urgency exist." *Darr v. Burford*, 339 U.S. 200, 218-19 (1950), *overruled in part on other*

-12-

*grounds*, *Fay v. Noia*, 372 U.S. 391 (1963).  A petitioner will not be allowed to present claims never before presented in the state courts unless he can show cause to excuse his failure to present the claims in the state courts and actual prejudice to his defense at trial or on appeal, or that he is actually innocent of the crime for which he was convicted.  *Coleman v. Thompson*, 501 U.S. 722, 748 (1991).

### C.    Procedural Default

The procedural default doctrine serves to bar review of federal claims that a state court has declined to address when a petitioner does not comply with a state procedural requirement. *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).  In these cases, "the state judgment rests on independent and adequate state procedural grounds." *Coleman,* 501 U.S. at 730.  For purposes of procedural default, the state ruling with which the federal court is concerned is the "last explained state court judgment." *Munson v. Kapture*, 384 F.3d 310, 314 (6th Cir. 2004) citing *Ylst v.Nunnemaker*, 501 U.S. 797, 805 (1991) (emphasis removed).  When the last explained state court decision rests upon procedural default as an "alternative ground," a federal district court is not required to reach the merits of a habeas petition. *McBee v. Abramajtys*, 929 F.2d 264, 265 (6th Cir. 1991).  In determining whether a state court has addressed the merits of a petitioner's claim, federal courts must rely upon the presumption that there is no independent and adequate state grounds for a state court decision absent a clear statement to the contrary.  *Coleman*, 501 U.S. at 735.

Applying this presumption, the Sixth Circuit Court of Appeals established a four-pronged analysis to determine whether a claim has been procedurally defaulted.  *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986).  Under the *Maupin* test, a reviewing court must decide:

(1)    whether the petitioner failed to comply with an applicable state procedural rule;

(2)    whether the state courts actually enforced the state procedural sanction;

(3)    whether the state procedural bar is an "adequate and independent" state ground on which the state can foreclose federal review; and

(4)    if the above are met, whether the petitioner has demonstrated "cause" and "prejudice."

*Id.* at 138.

Under the first prong of *Maupin*, there must be a firmly established state procedural rule applicable to the petitioner's claim and the petitioner must not have complied with the rule. *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991)(state procedural bar that is not "firmly established and regularly followed" cannot serve  to bar federal judicial review); *Franklin v. Anderson*, 434 F.3d 412, 418 (6th Cir. 2006.  The question of whether a state procedural rule was "firmly established and regularly followed" is determined as of the time at which it was to be applied. *Richey v. Mitchell*, 395 F.3d 660, 680 (6th Cir. 2005).

Under the second prong, the last state court to which the petitioner sought review must have invoked the procedural rule as a basis for its decision to reject review of the prisoner's federal claims. *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991) (appeal dismissed for lack of jurisdiction); *Richey*, 395 F.3d at 678 ("a lapsed claim survives if the state court overlooked the default and decided the claim anyway"); *Baze v. Parker*, 371 F.3d 310, 320 (6th Cir. 2004) (if a state court does not expressly rely on a procedural deficiency, then a federal court may conduct habeas review); *Gall v. Parker*, 231 F.3d 265, 310 (6th Cir. 2000)(even if issue is not raised below, where state supreme court clearly addresses the claim, no procedural bar arises); *Boyle v. Million*, 201 F.3d 711, 716-17 (6th Cir. 2000)(where a state appellate court characterizes its earlier decision as substantive, the earlier decision did not rely on a procedural bar; therefore, the cause and prejudice test does not apply).

Under the third prong, a state judgment invoking the procedural bar must rest on a state law ground that is both independent of the merits of the federal claim and is an adequate basis for the state court's decision.  *Munson v. Kapture*, 384 F.3d 310, 313-14 (6th Cir. 2004).

Under the fourth prong, a claim that is procedurally defaulted in state court will not be reviewable in federal habeas corpus unless the petitioner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or that failure to consider the claim will result in a fundamental miscarriage of justice.  *Coleman*, 501 U.S. at 751.  "Cause" is a legitimate excuse for the default, and "prejudice" is actual harm resulting from the alleged constitutional violation. *Magby v. Wawrzaszek*, 741 F.2d 240, 244 (9th Cir. 1984), *cert. denied*, 490

-14-

U.S. 1068 (1985).  If a petitioner fails to show cause for his procedural default, the reviewing court

need not address the issue of prejudice.  *Smith v. Murray*, 477 U.S. 527 (1986).

> Simply stated, a federal court may review federal claims:

> that were evaluated on the merits by a state court. Claims that were not so evaluated, either because they were never presented to the state courts (i.e., exhausted) or because they were not properly presented to the state courts (i.e., were procedurally defaulted), are generally not cognizable on federal habeas review.

*Bonnell v. Mitchel,* 301 F.Supp.2d 698, 722 (N.D. Ohio 2004).  The above standards apply to the

Court's review of Petitioner's claims.  Of course, Petitioner may excuse any procedural default with

a demonstration of "actual innocence" by the lesser "prependerance of the evidence" standard.

## IV.     STANDARD OF REVIEW

Under Section 2254, a state prisoner is entitled to relief if he is held in custody in violation

of the United States Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(d).

The AEDPA sets forth the standard of review for the merits of a petition for a writ of habeas

corpus.  The AEDPA provides:

> (d)     An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

> (1)     resulted in a decision that was *contrary to*, or involved an *unreasonable application of*, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (emphasis added).  In *Williams v. Taylor*, the Supreme Court clarified the

language of 28 U.S.C. § 2254(d) and stated:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.   Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).  Further, the Supreme Court declared that "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable."  *Id.* Elaborating on the term "objectively unreasonable," the Court stated that "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable."  *Id.*; *see also Bailey v. Mitchell,* 271 F.3d 652, 655-56 (6th Cir. 2001).

The Sixth Circuit Court of Appeals offers the following guidelines for applying the AEDPA limitations:

A.    Decisions of lower federal courts may not be considered.

B.    Only the holdings of the Supreme Court, rather than its dicta, may be considered.

C.    The state court decision may be overturned only if:

    1.    It '[applies] a rule that contradicts the governing law set forth in [Supreme Court of the United States] cases,' [the Supreme Court precedent must exist at the time of petitioner's direct appeal] or;

    2.    the state-court decision 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent;' or

    3.    'the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case;' or

    4.    the state court 'either unreasonably extends a legal principle from [a Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'

D.    Throughout this analysis the federal court may not merely apply its own views of what the law should be. Rather, to be overturned, a state court's application of Supreme Court of the United States precedent must also be objectively unreasonable.  That is to say, that 'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or

-16-

> incorrectly.' 'An unreasonable application of federal law is different from an incorrect or erroneous application of federal law.'
>
> E.  Findings of fact of the state courts are presumed to be correct. 'The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.'

*Bailey v. Mitchell,* 271 F.3d 652, 655-56 (6th Cir. 2001) (internal citations omitted).

Finally, a reviewing federal court is bound by the presumption of correctness, under which the federal court is obligated to "accept a state court's interpretation of the state's statutes and rules of practice." *Hutchinson v. Marshall*, 744 F.2d 44, 46 (6th Cir. 1984), *cert. denied*, 469 U.S. 1221 (1985); *see also Duffel v. Duttion*, 785 F.2d 131, 133 (6th Cir. 1986).  The presumption of correctness is set forth in 28 U.S.C. § 2254(e), which provides:

> (e)(1)In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.

28 U.S.C. § 2254(e).  The presumption of correctness applies to basic primary facts, and not to mixed questions of law and fact.  *Levine v. Torvik*, 986 F.2d 1506, 1514 (6th Cir. 1993), *cert. denied,* 509 U.S. 907 (1993).  The presumption also applies to "implicit findings of fact, logically deduced because of the trial court's ability to adjudge the witnesses' demeanor and credibility." *McQueen v. Scroggy*, 99 F.3d 1302, 1310 (6th Cir. 1996), *cert. denied*, 520 U.S. 1257 (1997). Furthermore, a reviewing federal court is not free to ignore the pronouncement of a state appellate court on matters of law.  *See Central States, Southeast & Southwest Areas Pension Fund v. Howell*, 227 F.3d 672, 676, n.4 (6th Cir. 2000).  Petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

The United States Supreme Court recently observed:

> Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal.  *Jackson v. Virginia*, 443 U.S. 307, 332, n. 5, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (Stevens, J., concurring in judgment).  As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Harrington v. Richter,* __ U.S. __, 131 S.Ct. 770, 786-787 (2011).

**V.**     **28 U.S.C. § 2244(a)(2)(B)**

**A.**     **Standard of Review**

28 U.S.C. 2244(a)(2) reads, in its entirety:

A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless–

> (A) the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

> (B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and

> (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

Respondent concedes, with some exceptions, that Petitioner has met his burden under subsection (a)(2)(B)(i), that is, that Petitioner could not have discovered the evidence he relies upon previously through the exercise of due diligence. The Sixth Circuit, in granting authorization to file a successor petition, noted that "the new evidence Bell cites are 1990 police reports that were withheld from the defense and which Bell was not able to obtain until November 2006." *In re Bell*, No. 08-3831, Order, p. 3 (6th Cir. June 16, 2009). Accordingly, the resolution of the section 2244 issue turns on the subsection (a)(2)(B)(ii) determination, that is, whether the facts underlying Petitioner's claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for the constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

In his briefs, Petitioner asserts a claim of "actual innocence," which, in this case, serves two purposes. Of course, Petitioner must demonstrate "actual innocence" in order to fulfill the subsection (a)(2)(B)(ii) requirement for his successor petition. However, Respondent, in his brief, contends that the petition is untimely and also that Petitioner's claims are procedurally barred. Petitioner asserts that he can demonstrate "actual innocence" in order to avoid dismissal of an untimely petition and to resurrect claims that are procedurally barred.

-18-

Both Petitioner and Respondent appear to argue that a preponderance of the evidence standard applies to Petitioner's "actual innocence" claim based upon the United States Supreme Court's decision in *Schlup v. Delo*, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995).  In *Schlup*, a pre-AEDPA case, the Supreme Court held that a petitioner who asserts a credible claim of actual innocence in his original petition can avoid a procedural bar to the consideration of the merits of his constitutional claims.  *Id.* at 327, 115 S.Ct. 851.  The Sixth Circuit has also held that a petitioner who presents a credible claim of actual innocence is entitled to equitable tolling of AEDPA's statute of limitations.  *Souter v. Jones*, 395 F.3d 577, 601 (6th Cir.2005).

However, in *Schlup,* the Court distinguished habeas petitions asserting claims of actual innocence in cases where no constitutional error is alleged, as in *Herrera v. Collins*, 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993), from petitions in cases where a constitutional error allegedly occurred.  *Schlup*, 513 U.S. at 314–15, 115 S.Ct. 851 (1995).  The petitioner in the latter scenario does not argue that his innocence entitles him to habeas relief, but rather that his innocence entitles him to have a federal court consider the merits of his constitutional claims despite a procedural bar that would ordinarily preclude such review.  *Id.* at 315, 115 S.Ct. 851. In such a case, a credible claim of actual innocence only operates as a "gateway" through which a petitioner may pass and obtain federal review of his claims.  *Id.*  Accordingly, the *Schlup* Court concluded that, where a petitioner's claim of actual innocence is for the purpose of having the court determine whether the constitutional errors alleged in the habeas petition warrant relief, the petitioner is required to meet a less stringent standard than in cases where the petitioner seeks habeas relief solely on the basis of his claimed innocence. *Id.* at 316, 115 S.Ct. 851.

The Supreme Court articulated the difference between the two situations as follows:

> If there were no question about the fairness of the criminal trial, a *Herrera*-type claim would have to fail unless the federal habeas court is itself convinced that those new facts unquestionably establish [the petitioner's] innocence.  On the other hand, if the habeas court were merely convinced that those new facts raised sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial without the assurance that trial was untainted by constitutional error, [the petitioner's] threshold showing of innocence would justify a review of the merits of the constitutional claims.

*Id.* at 317, 115 S.Ct. 851.

-19-

The intermediate appellate court concluded that the petitioner in *Schlup* could not obtain review of his procedurally barred claims because he did not satisfy the standard set forth in *Sawyer v. Whitley*, 505 U.S. 333, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992)(successive, abusive, defaulted claims in death penalty case).  To obtain review under the *Sawyer* standard, a habeas petitioner was required to show "by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner [guilty]." *Id.* at 336, 112 S.Ct. 2514.  The Supreme Court granted *certiorari* in *Schlup* to determine whether the *Sawyer* standard was the proper standard to apply in this situation.  The Supreme Court held that the standard set forth in *Murray v. Carrier*, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986), which requires a petitioner to "show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt," rather than the *Sawyer* standard, applied. *Schlup*, 513 U.S. 298, 327, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995).

In support of its holding that a lower burden of proof was more appropriate, the Court emphasized the fundamental principle of American society that it is better to let a guilty man go free than to convict an innocent man. *Id.* at 325, 115 S.Ct. 851.  Although the Court recognized "that a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare," *id.* at 323, 115 S.Ct. 851, the *Carrier* standard nonetheless struck the appropriate balance between ensuring that a petitioner's ability to overcome a procedural bar by establishing a credible claim of actual innocence remains "extraordinary," and "still providing petitioner a meaningful avenue by which to avoid a manifest injustice," *id.* at 327, 115 S.Ct. 851.

To proceed through the *Schlup* gateway a petitioner must present a "credible" claim of actual innocence.  This "requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence that was not presented at trial." *Id.* at 324, 115 S.Ct. 851. The Court explained the standard that lower courts should undertake in this situation:

> The *Carrier* standard is intended to focus the inquiry on actual innocence. In assessing the adequacy of petitioner's showing, therefore, the district court is not bound by the rules of admissibility that would govern at trial.  Instead, the emphasis on "actual innocence" allows the reviewing tribunal also to consider the probative

> force of relevant evidence that was either excluded or unavailable at trial.... The habeas court must make its determination concerning the petitioner's innocence "in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial."

*Id.* at 327–38, 115 S.Ct. 851 (citations omitted).

In this circumstance, actual innocence "does not merely require a showing that a reasonable doubt exists in the light of the new evidence, but rather that no reasonable juror would have found the defendant guilty." *Id.* at 329, 115 S.Ct. 851. However, this standard is less strict than the insufficient evidence standard outlined in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), which "looks to whether there is sufficient evidence which, if credited, could support the conviction," because it focuses on what a reasonable juror would do. *Id.* at 329-30, 99 S.Ct. 2781 (emphasis added).

The *Carrier* standard "does not require absolute certainty about the petitioner's guilt or innocence." *House v. Bell*, 547 U.S. 518, 538, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006). Nor is "the mere existence of sufficient evidence to convict" outcome determinative. *Schlup*, 513 U.S. at 330, 115 S.Ct. 851. Rather, the standard is a probabilistic one that requires a petitioner to show that upon consideration of the new evidence "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 327, 115 S.Ct. 851. In undertaking this probabilistic inquiry, "[i]t must be presumed that a reasonable juror would consider fairly all of the evidence presented ... [and] would conscientiously obey the instructions of the trial court requiring proof beyond a reasonable doubt." *Id.* at 329, 115 S.Ct. 851.

However, the Sixth Circuit in *Souter, supra,* acknowledged that, "in AEDPA, Congress adopted a more stringent actual innocence exception in the successive-petition and evidentiary-hearing provisions, requiring that the factual predicate of the claim could not have been discovered earlier and a showing 'by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.' 28 U.S.C. §§ 2244(b)(2)(B); 2254(e)(2)." *Souter v. Jones*, supra,  n. 5.  The *Souter* Court further observed:

> The adoption of a narrower actual innocence exception in these two specific instances did not alter the general *Schlup* actual innocence standard applicable in

-21-

cases involving other types of procedural default. Accordingly, after AEDPA, we have continued to apply the *Schlup* actual innocence standard unless the case falls within one of the two statutorily-defined areas requiring the heightened standard. See *Williams v. Bagley*, 380 F.3d 932, 973 (6th Cir.2004). Furthermore, the United States Supreme Court has continued to apply the more lenient *Schlup* standard in defining a miscarriage of justice in other circumstances, which reinforces the conclusion that Congress was not acting to alter the actual innocence standard beyond the two specific provisions in AEDPA. See *Calderon v. Thompson*, 523 U.S. 538, 558, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998) ("It is true that the miscarriage of justice standard we adopt today is somewhat more lenient than the standard in §2244(b)(2)(B).").

Accordingly, the Court must determine whether Petitioner has met his burden to demonstrate that no reasonable factfinder would have found him guilty of murder and attempted murder, but for the alleged constitutional violations, by clear and convincing evidence, rather than by a preponderance of the evidence, in order to grant the requested relief in this case. Of course, with respect to Petitioner's gateway claim of "actual innocence," asserted to avoid dismissal of the petition for failure to timely file the petition and to excuse procedural default of his claims, the preponderance of the evidence standard applies.

Petitioner mischaracterizes the law in his reply brief. He writes, "Although the successor standard is 'demanding and permits review only in the extraordinary case,' the 'standard does not require absolute certainty about the petitioner's guilt or innocence.' *Rivas v. Fischer*, 687 F.3d 514 (2d Cir. 2012)(citing *House v. Bell*, 547 U.S. 518, 538 (2006). '[I]t may be enough for the petitioner to introduce credible new evidence that thoroughly undermines the evidence supporting the jury's verdict.' *Rivas*, 687 F.3d at 543, citing *House*, 547 U.S. at 553-54." ECF Dkt. #113 at p 11. In fact, the Second District in *Rivas* and the United States Supreme Court in *House*, were articulating the standard of review under *Schlup,* rather than the successor standard.

However, the Second District reasoned that, because a *Schlup* claim involves evidence the trial jury did not have before it, the inquiry requires the federal court to assess how reasonable jurors would react to the overall, newly supplemented record, and if the new evidence so requires, this may include consideration of the credibility of the witnesses to be presented at trial. The undersigned recommends that the foregoing standard should apply with equal force to an "actual innocence" claim in a successor petition. Of course, the higher burden of proof – clear and convincing evidence – still applies.

-22-

Furthermore, the Sixth Circuit recently noted that "new evidence" includes both newly discovered evidence, i.e., evidence unavailable at the time of trial and newly presented evidence, i.e., evidence not presented to the jury.  *Cleveland v. Bradshaw*, 693 F.3d 626 (6th Cir. 2012), citing *Souter v. Jones*, 395 F.3d 577, 596, n. 9 (6th Cir. 2005).  In a *Schlup* analysis, the evidence is to be considered in its totality without regard to the rules of admissibility.  *House*, 547 U.S. at 538.  The standard therefore requires reviewing courts to "consider all the evidence, old and new, incriminating and exculpatory," and, viewing the record as a whole, to "make a probabilistic determination about what reasonable, properly instructed jurors would do."  *Id.* at 538, 126 S.Ct. 2064 (internal citations omitted).  The undersigned recommends that the foregoing standard should apply to an "actual innocence" claim in a successor petition as well.

  **B.**  <u>**Newly discovered evidence**</u>

Petitioner relies upon both documentary and testimonial evidence to meet his dual burdens under *Schlup* and subsection (a)(2)(B)(ii).  Of course, Petitioner's burden to establish "actual innocence" under *Schlup* is a gateway burden, if Respondent can show that the petition is untimely or that Petitioner's claims have been procedurally defaulted, whereas his burden to demonstrate "actual innocence" under § 2244(A)(2)(B)(ii) is largely intertwined with the merits of his petition. Because a discussion of the "new evidence" is relevant to many parts of the analysis, the undersigned shall address the "new evidence" as a matter of initial concern.  In the table of contents of his brief, Petitioner summarizes the new evidence as follows:

  1.  Greene's Inconsistent Descriptions of Shooter

  2.  Greene Confessed He Did Not Know Who Shot Him

  3.  Triplett and Greene have a History of Drug Offenses

  4.  Monica Harris's Criminal Record and Drug Use

  5.  No One at Atlantic Gun & Tackle Identified [Petitioner]

  6.  Failure to Investigate Potential Eyewitnesses

  7.  Damage to Buick 225 Consistent with Shooting

  8.  Failure to Conduct Forensic Examinations of Paint Scrapings

-23-

9.    Police Credibility In Doubt

10.    Subsequent Shootings of Greene's Residence

11.    Collective Effect of Newly Discovered Evidence

ECF Dkt. #104 at pp. 3-4.  The undersigned will discuss all of the evidence listed above, plus additional "new evidence" that Petitioner addressed in an earlier part of his brief.

### 1.    Alternative suspects that were not disclosed to Petitioner's trial counsel

Petitioner contends that there existed numerous alternate suspects at the time of the shooting, none of which were disclosed to Petitioner's trial counsel.  Although Petitioner identifies five alternative suspects, four are of little significance.  Moreover, Greene was unable to identify the fifth alternative suspect, and, therefore, he was ruled out as a suspect.

The first alleged suspect is Teddy Cooper, Jr.  An East Cleveland Police Department ("ECPD") field identification card dated November 14, 1990 indicates that police saw a white Oldsmobile Cutlass Supreme circling the area approximately three hours after the shooting occurred. ECF Dkt. 96-8 at 1.  Police stopped the driver, Teddy Cooper, Jr., who claimed he was "curious as to what was going on."  ECF Dkt. #89-1 at 15.  At the time, Cooper was wearing a blue Cleveland Cavaliers jacket, blue corduroy pants, and a blue sweater.  Cooper had no outstanding warrants, and, as a consequence, he was released.  Petitioner has offered no evidence, only speculation, that Cooper was the perpetrator.

Next, Petitioner contends that two men, identified as Norwood Branch and James LNU were suspects.  The two men appeared at the home of Triplett's mother and informed Triplett's brother, Devlin Triplett, that Triplett had been killed on Shaw Avenue.  Triplett's sister, Allegra Triplett, found the information to be suspicious, because Branch claimed that he was in the area of Hayden and Shaw because he made a wrong turn.  Other than the unsubstantiated suspicion of Allegra Triplett, Petitioner has offered no evidence to suggest that either Branch nor James was involved in the shooting.  ECF Dkt. #8-3 at 49, 52.

Petitioner identifies the fourth possible suspect as Triplett's former girlfriend, Monique Brooks.  Allegra Triplett identified Brooks as Triplett's only enemy.  ECF Dkt. #8-3 at 51. Allegra told police that Triplett and Brooks attacked one another in August after Brooks cut the tires on

Triplett's automobile.  According to Allegra, Brooks threatened Triplett, and Triplett told Allegra that four of Brooks' male friends approached him at the skating rink and "were going to jump on him."  ECF Dkt. #8-3 at 51.  Then, the men asked Triplett for five dollars.  Triplett told Allegra that, because there were four of them, he left the skating rink.  Allegra further stated that Triplett was approached by the same men and "they had words" a few days before the shooting.  Greene confirmed that Brooks had threatened that she was going to have somebody "fuck [Triplett and Greene] up."  *Id.* at 53.

Detectives Patrick Gard and Inez Ventura interviewed Brooks on November 20, 1990.  ECF Dkt. #8-3 at 54.  Brooks confirmed that she and Triplett had an altercation when she discovered him with a previous girlfriend.  She stated that Triplett struck her in the face and knocked her to the ground, and, in turn, she slashed his tires.  She remembered that they both exchanged threats that evening.  Brooks stated that she was at home the night of the shooting with her cousin, Banita Bell, and Brooks' current boyfriend.  *Id.*  Like the other alleged suspects, Petitioner has offered no evidence that Brooks or her male friends were actually involved in the shooting.

The final alternative suspect is Henry Hayes, a junior high school teacher at A.B. Hart School in Cleveland.  An ECPD parking ticket issued on November 16, 1990, indicates that a patrolman ticketed a 1991 four-door Buick illegally parked on East 134th Street in East Cleveland – just two blocks from the shooting.  ECF Dkt. #8-3 at 55.  The Buick was registered to Henry Hayes, who lived in Shaker Heights, Ohio and whose girlfriend lived on Shaw Avenue.  The ticketing officer noted Hayes's Buick matched the description given by witness Tommy Hobbs for the shooter's car – a white, beige or cream colored 1978 or 1979 Buick Model 225.  The ticketing officer also noted a hat in Hayes's Buick matching Greene's description of what the shooter was wearing – a black Pittsburgh Pirates baseball cap.

Although Greene consistently identified the suspect vehicle as a white Oldsmobile Cutlass, two other eyewitnesses to the shooting identified a different car.  Tommy Hobbes was on duty at the Toby and Troy's Sunoco at the corner of Hayden and Shaw the night of the shooting.  He observed a yellow Buick Electra 225 traveling westbound on Shaw in the curb lane and a blue

Cadillac traveling westbound in the second lane from the curb.  ECF Dkt. #89-2 at 4.  Hobbes observed shots fired from the Buick at the males in the Cadillac.

Rebecca Cooper was working at the Hayden and Shaw Marathon station. Cooper observed a light colored car and a dark colored car traveling westbound on Shaw at Hayden the night of the shooting.  She heard shots fired and, when she saw the dark colored car lose control, she presumed that the shots came from the light colored car.  ECF Dkt. #89-2 at 4, 6, 8.  At a follow-up interview, Cooper stated that the light colored vehicle had Landau lights, which were lit on the passenger side of the vehicle.  *Id.* at 8.

According to an ECPD report dated November 16, 1990, Gard and Ventura went to Hayes's address in Shaker Heights, to inquire about the white, four-door Buick that police ticketed near Shaw Avenue on November 15, 1990. ECF Dkt. #8-3 at 58.  At that address, they found a white 1984 Buick Park Avenue in the driveway.  When police told Hayes his car matched the description of the car involved in a shooting on November 14, 1990, Hayes claimed the car had not been moved from the Shaker Heights address. *Id.* at 58. Gard and Ventura arrested Hayes, who had a prior arrest for assault, for investigation in the shooting.  It is important to note that Hayes' driver's license was suspended at the time.

On the way to the police station, Hayes again claimed his car had not been moved for several days from the Shaker Heights address. When told his car was ticketed on the morning of November 15, 1990, Hayes admitted that he was at his girlfriend's house on November 14, 1990. Police asked Hayes about the Pittsburgh Pirates baseball cap that had been in his car when police ticketed the car.  Hayes claimed he did not own such a hat and there was no such hat in his car. Hayes' car was towed and processed.  *Id.*

According to an ECPD report dated November 17, 1990, Gard questioned Hayes about his car and his whereabouts on the night of the shooting. Hayes claimed his car was parked all night on the corner of Shaw and East 134th in East Cleveland and that he had no knowledge of the shooting. ECF Dkt. #8-3 at 60.  Hayes further stated the Landau lights on his car worked only on the driver's side.  Gard asked Hayes about the Pittsburgh Pirates cap seen by police in his car, and he again claimed he did not own one. Hayes instead claimed there was a black leather baseball cap

in his car. Hayes was released on a waiver but advised that his vehicle matched the suspect vehicle and would be tested by BCI. ECF Dkt. #8-3 at 59.

Gard contacted Hayes's girlfriend, Rita Jackson. At the time of the shooting, Jackson claimed Hayes was with her at her apartment located at 13319 Shaw Avenue, which is next to the residence where the shooting occurred. ECF Dkt. #96-3 at 1. The area canvas log completed by ECPD officers on November 14, 1990, shows that an officer knocked on the door of 13319 Shaw Avenue after the shooting and received no response. ECF Dkt. #96-14 at 1. Jackson stated that they did not know about the shooting until the next morning because she and Hayes were "upstairs and she sleeps with the radio on." ECF Dkt. #8-3 at 59.

On November 17, 1990, Detectives Kalvitz, Johnson, and "Rospierski" visited Greene in the hospital. Greene was shown a series of photographs, which included a photograph of Henry Hayes. Greene stated that he could not be sure and that the suspect was not clear in his mind. *Id.* at 60. Greene was then shown a photograph of Hayes' automobile. Greene responded that the suspect was driving "what he believed to be a 1982 in that area Cutlass." Greene further related that his friend, Chip, had a vehicle similar to the suspect vehicle. As a consequence, the detectives ruled Hayes out as a suspect. Like the other alleged suspects, Petitioner has offered no evidence that Hayes was actually involved in the shooting.

## 2. Ann Edwards allegedly coerced witness statement

Petitioner offers the deposition testimony of Ann Edwards in support of his petition. Edwards was Petitioner's girlfriend in November of 1990, and, according to her statement to ECPD, ECF Dkt. #93-3 at 30, she was present when Petitioner confessed to the shootings at Shaw and Hayden on November 14, 1990. Her statement, which was witnessed by Kalvitz and Johnson, reads, in pertinent part:

> [Petitioner] left my apartment to go buy some beer. He told us [Edwards and Harris] he was going on St. Clair to buy it. He left out and then he came back. When he came back he was acting real weird and then he tells me and [Harris] what had happened. He tells us that he and these two guy [sic] were racing down Euclid Ave., or they pulled up next to each other at the light. He tells us that the guys rolled down their window and looked at him, you know he was telling us that they looked like they were going to pick with him. Then he says that he pulls out his gun and he just shot them, and that he emptied his gun and pulled off. He went and got the beer and came back with it. Then he takes [Harris] in the other room and he tells her to take the gun, she took it and went up stairs to her apartment and then she

-27-

came back down and we drank some beers and that was it.  But I didnt [sic] know anyone of them died but I think he did because he kept looking into [sic] the paper for some news and then we just didnt [sic] talk about it anymore.

*Id.*

At her deposition, Edwards claimed that Petitioner did not confess to her that he was responsible for the shooting at Hayden and Shaw.  Edwards stated that she felt compelled to sign the witness statement for several reasons: First, when the police searched her mother's apartment on November 26, 1990, she was thrown against a wall, handcuffed, and arrested along with Petitioner, ECF Dkt. #86-1 at 11-12, 24-25.  Furthermore, she was told that she could be convicted of the crimes committed at Shaw and Hayden, because the detectives told her that witnesses to the shooting saw a woman in Petitioner's car. *Id.* at 33. Edwards stated that the detectives were screaming at her to make a statement, and she did not know the law. *Id.* at 15. She further stated that the detectives showed her graphic photographs of Petitioner and Harris, as well as love letters exchanged between the pair. *Id.* at 30-31.  However, Edwards conceded that, although she was upset by the photographs, they did not shock her. *Id.* at 32. Finally, Edwards stated that she was kept overnight at the police station, and that she would have signed anything because she was terrified. *Id.* at 27, 30.

Edwards also claimed that she did not know the contents of her witness statement because she was illiterate. *Id.* at 34. However, when she was asked if the statement documented what she told ECPD detective, she responded, "I guess so." *Id.* at 16.  Moreover, when she was asked if Petitioner told her and Harris about the shooting, Edwards responded, "Like I told [Respondent's counsel], he didn't tell me.  He told her." *Id.* at 22.

Edwards testified that she probably spoke to Petitioner's pre-trial investigator, but that she would have refused to testify in court. *Id.* at 45-46.

Edwards deposition testimony directly contradicted the deposition testimony of Kalvitz and Johnson, who stated that Edwards was never under arrest, that she willingly cooperated with them, and that she was asked to initial each response in her witness statement because the detectives were aware of the significance of her statement.  Furthermore, neither Kalvitz nor Johnson recalled Edwards stating that she was illiterate.  Likewise, neither Kalvitz nor Johnson admitted to showing

-28-

Edwards suggestive photographs of Petitioner and Harris.  Edwards' deposition testimony also contradicted Harris' trial testimony, that is, Harris claimed that Edwards was present when Petitioner confessed to the crimes.

In addition to being at odds with the testimony of Kalvitz, Johnson, and the trial testimony of Harris, Edwards' deposition testimony is also internally inconsistent.  Edwards claimed that she was terrified and that she would have done anything asked by the police.  However, Edwards denied retrieving the duffel bag filled with weapons for the detectives.  When asked if she voluntarily turned over the duffel bag, she responded, "Are you for real?  No."  *Id.* at 14. Edwards stated that the detectives found the weapons during their search.  *Id.* at 27.

Perhaps the most important part of Edwards' deposition is what she did not say.  Edwards' deposition appears to have been offered to contradict Harris' testimony at trial. However, Edwards merely stated that she was not present when Petitioner confessed to Harris.  She did not testify that Petitioner did not confess to Harris, or that the detectives told her to fabricate Petitioner's confession.  Although she testified that she felt threatened by the detectives' behavior, her testimony fell far short of establishing that Kalvitz and Johnson compelled her to provide false testimony.

Finally, having watched Edwards' deposition testimony, the undersigned finds that her testimony is not worthy of credence.  First, Edwards conceded that she is the mother of Petitioner's child, although it is not clear from the record when the child was born.  *Id.* at 16. As a consequence, Edwards admitted that she has a bias as to the outcome of the petition.  Moreover, Edwards' demeanor at the deposition was not the demeanor of a witness who was finally given the opportunity to unburden herself of a lie after more than twenty years.  She was clearly uncomfortable and often times abrasive.

In summary, Edwards' testimony did not establish that Petitioner did not confess to the shooting at Shaw and Hayden.  To the extent that Edwards' deposition testimony called into question Hayes' trial testimony that Edwards was present when Petitioner confessed to the crimes, her deposition testimony was contradicted by the lion's share of the evidence, was internally inconsistent, and lacked credibility due to her bias and her demeanor at the deposition.

-29-

### 3. Greene initially described the suspect vehicle as a four-door Cutlass

Petitioner contends that his trial counsel could have impeached Greene's description of the suspect vehicle at trial, if evidence had been disclosed that Greene initially described the suspect vehicle as a four-door Cutlass, rather than a two door Cutlass.  On November 15, 1990, Kalvitz and Johnson asked Greene to write a description of the suspect vehicle, and Greene wrote, "White 4 Cutlass." ECF Dkt. #91-2 at 36.  At trial, Greene denied ever having described a four-door vehicle.  At trial, Detective Kalvitz explained that the confusion arose from the fact that Greene, in describing the suspect vehicle, likened it to a Cutlass owned by one of his friends.  However, Greene's friend owned a four-door version of the Cutlass that Greene described.  ECF Dkt. #13-15 at 75.

Petitioner's trial counsel cross-examined Greene and the detectives regarding Greene's initial description of the suspect vehicle.  Greene denied ever describing the suspect vehicle as a four-door Cutlass.  ECF Dkt .#13-14 at 1371-1374. Petitioner contends that Greene altered his testimony on November 28, 1990, when he was shown a photograph of Petitioner's vehicle.  Petitioner further contends that his trial counsel could have impeached Greene's identification of Petitioner's two-door Cutlass with the November 15, 1990 handwritten description of the four-door Cutlass. Petitioner's claim as it relates to the alleged false testimony of Greene is addressed in the merits portion of the analysis.

### 4. Greene's confession that he did not know who shot him and his inconsistent description of the shooter

Petitioner contends that newly discovered evidence calls into question Greene's identification of Petitioner as the gunman.  Petitioner cites the testimony of a fellow inmate, Randy Collins, who told Petitioner that Greene confessed to Collins in 1992 that he did not know who shot him.  ECF Dkt. #94-1.  According to Collins' deposition testimony, Collins and Greene were incarcerated in Pickaway Correctional Institution in 1992.  One day, the two men were comparing gunshot wounds.  When Collins asked Greene if he knew who shot him, Greene responded that he did not know, and that "it could be [Collins]" who shot him.  *Id.* at 11.

Collins admitted at his deposition the he did not know if Greene was telling the truth in 1992.  *Id.* at 38-40.  Moreover, despite the fact that Collins testified that " he is always the type of

curiosity" and when he is listening to a story it is "like watching tv," *Id.* at 10, Collins did not inquire as to whether anyone had been convicted for Greene' shooting or elicit any additional information about the shooting.

Later, Collins met Petitioner in the Trumbull Correctional Institution.  Petitioner told Collins that he was in prison for "something [he] didn't do."  *Id.* at 12.  Collins recognized Petitioner's story and told Petitioner about his conversation with Greene in 1992.  Petitioner attached to his petition an affidavit that Petitioner prepared and Collins signed on December 3, 1997, attesting to the alleged confession made by Greene is 1992.

Recanting affidavits are always viewed with "extreme suspicion." *Williams v. Coyle*, 260 F.3d 684, 708 (6th Cir.2001), quoting *United States v. Chambers*, 944 F.2d 1253, 1264 (6th Cir.1991).  In other words, if Petitioner had offered Greene's sworn testimony that he lied under oath at the trial,  the Court would be compelled to view it suspiciously.  Instead, Petitioner offers the testimony of a fellow inmate who provided virtually no details surrounding his conversation with Greene other than the fact that Greene repeatedly conceded that he did not know the man who shot him. Collins provided no additional information regarding the alleged conversation with Greene, despite the fact that, when Collins was asked whether he was certain that the man at Pickaway was the same Ronald Greene, he responded, "[O]h yes, because [Petitioner] explained to me what was said in the court.  He told me stuff that was said that I knew this guy said to me, you know, and I knew neither him nor neither Ronald Greene."  ECF Dkt. #94-1 at14.  Because Collins' testimony lacks any credible foundation, that is, any additional details surrounding Greene's alleged confession, the undersigned finds that it is not reliable.

In addition to Collins' testimony, Petitioner contends that Greene's description of the gunman changed over the course of the pretrial and trial phases of the case.  At the scene, Greene did not give officers a description of the perpetrator, instead, he repeated "white Olds Cutlass" several times.  ECF Dkt. #13-13 at 589.  At trial, Greene testified that, the first time he was shown pictures of suspects on November 19, 1990, he did not identify any of the individuals in the photographs as the shooter. ECF Dkt. #13-14 at 169.  However, ECPD reports from the November

-31-

19, 1990 visit indicate Greene stated the "suspect was not clear in his mind at this time." ECF Dkt. #93-3 at 26.

At trial, Greene testified he told officers the shooter was a "light skinned guy" who was "23, 24" years of age, with a mustache and an "afro curl, a black jacket, and a black hat" with the black hat "turned to the side." *Id.* at 1356, 1386-1387. However, the ECPD records reveal that Greene's description of the shooter to police on November 16, 1990 did not include an "afro" or mustache, or a black jacket. Greene stated that the perpetrator was a light skinned guy, 23 or 24 years of age, with a black hat. ECF Dkt. #87-2 at 6. The night of the shooting, Greene described the shooter as having a "medium" complexion, not light-skinned. ECF Dkt. #1-1 at 70.

Greene also testified that, on November 28 and December 4, 1990, he identified pictures of Petitioner from photo arrays, identifying Petitioner as the shooter. ECF Dkt. #13-14 at 172, 174, 215. Both of the photographs that Greene chose on November 28 and December 4 show Petitioner with a mustache and goatee; however, Greene admitted he never told police the shooter had a goatee. *Id.* at 255-256, 262, 264-265. Greene testified the shooter had no scars on his face, even though in court Greene acknowledged the acne scars on Petitioner's face. *Id.* at 203, 262.

Greene testified that he first told Kalvitz that the shooter wore "a Pittsburgh Pirates' cap." *Id.* at 173, 195-196. Greene further admitted he saw no studs or rhinestones or a logo on the cap at the time of the shooting. *Id.* at 198. At the suppression hearing, Greene again stated the cap was a "Pittsburgh Pirates hat." ECF Dkt. #13-12 at 74. On cross-examination, Greene admitted he could not positively identify the jacket or the Raiders cap. *Id.* at 195-198, 233.

At the trial, Kalvitz testified that on November 28, 1990, Greene, who was in critical condition, identified a photograph of Petitioner out of a photo array "without hesitation." ECF Dkt. #13-15 at 24-25. The ECPD report for November 28, 1990, indicates that Greene said the pictures of a black leather jacket and Raiders cap were "similar" the clothing worn by the suspect. ECF Dkt. # 1-1 at 77.

On December 4, 1990, Greene identified a different photograph of Petitioner out of a second photo array. ECF Dkt. #96-20 at 1. The December 4, 1990 visit is the first time Greene claims he

saw the shooter with a Raiders hat.  Greene states that he knows the shooter's hat and coat to be dark in color, and that the that "had markings on it."  *Id.*

Based upon the foregoing evidence, Petitioner argues that Greene's identification was suspect.  Petitioner further argues that, at trial, Greene admitted to drinking a six-pack of beer the evening he was shot. ECF Dkt. #13-14 at 184.  Petitioner relies upon Greene's consumption of alcohol, coupled with the brief amount of time he actually saw the perpetrator, as well as the traumatic injuries he suffered to argue that his identification should be nullified by this Court.

At trial, Greene was cross-examined about the inconsistencies in his initial description of the perpetrator.  Petitioner's trial counsel questioned Greene regarding his failure to describe Petitioner's facial hair and scars, his afro curl, and mustache.  Because Greene's initial description of the perpetrator was the subject of thorough cross-examination, and the jury nonetheless credited Greene's testimony,  the undersigned recommends that the trial court find that ECPD reports do not constitute newly discovered evidence that would have altered the outcome of the trial.

### 5.    Tripplett and Greene have a history of drug offenses

The parties stipulated that both Tripplett and Greene had prior drug convictions. From 1989 to 1990, Tripplett had four prior drug convictions for cocaine, with the latest conviction occurring on November 8, 1990, just days before his death.  Greene told the jury that he had one prior conviction for drug abuse, when, in fact, he had two prior convictions for cocaine.  Petitioner argues, "Despite the victims' ties to drug trafficking, Patrick Gard, one of the ECPD detectives assigned to the case, admitted at is deposition that he did not know if police ever investigated whether the shooting was drug related."  ECF Dkt. #90 at 62.

First, the criminal histories of both of the victims were matters of public record at the time of trial, and, for that reason, do not constitute newly discovered evidence.  To the extent that Gard's testimony that the police never considered the victims' involvement in drugs as a possible motive for the attack constitutes newly discovered evidence, Petitioner's argument based upon that evidence is purely speculative.  Petitioner has not produced any evidence to support the conclusion that the attack was the result of the victims' involvement in drugs.

### 6.      Monica Harris' criminal record and drug use

Petitioner contends that Monica Harris was a crack cocaine user and a "strawberry," that is, a prostitute who trades intercourse for drugs.  The parties stipulated that, in March of 1991, just four months before Petitioner's trial, Harris was convicted of attempted drug abuse of cocaine, having been found in possession of a crack cocaine tube, and was given a six-month suspended sentence.  Petitioner's trial counsel asked Harris on cross-examination whether she was "using cocaine in the autumn of 1990" but the trial court did not permit Harris to answer. ECF Dkt. #13-14 at 243. Petitioner contends that "Harris admitted , outside the presence of the jury, she used cocain the night of the shooting. After additional closed-session questioning, Harris recanted this statement, involving the Fifth Amendment, then recanted altogether and denied any drug or alcohol use that night."  ECF Dkt. #104 at 68.

To the contrary, Harris testified that she used cocaine during that time, but that she was not under the influence of any drug on the evening that Petitioner confessed to the shootings.  ECF Dkt. #13-14 at 327.  The trial court concluded that, unless Harris was under the influence of drugs on that specific evening, Harris' drug use was not relevant to her testimony.  *Id.*  Like the evidence relating to Triplett and Greene's previous drug convictions, Harris' drug use was a matter of public record and, therefore, not newly discovered evidence.  Moreover, Petitioner fails to cite any evidence that suggests that Harris' drug use influenced her testimony at trial, and, as a consequence, Petitioner's argument based upon Harris' drug use is purely speculative.

### 7.      No one at Atlantic Gun & Tackle identified Bell

Harris testified at trial that, in October of 1990, Petitioner took her to a gun shop where he bought bullets and clips.  *Id.* at 272-273, 307. Harris had earlier told police that she went with Petitioner and Ann Edwards to Atlantic Gun and Tackle. ECF Dkt. #8-5 at 4.  Petitioner argues that his trial counsel was not permitted to elicit testimony from Kalvitz as to whether anyone at the gun shop remembered seeing Petitioner. ECF Dkt. #13-15 at 46. The state objected to the question, apparently based upon hearsay, and the trial court sustained the objection.  *Id.*  Petitioner contends that ECPD records reveal that "no employee of Atlantic Gun and Tackle remembered seeing Petitioner or Edwards."  ECF Dkt. #104 at 69.  The police report reads, in pertinent part, "After

viewing the photos [of Petitioner and Edwards] Gary Hill could not say if they were customers or not, he just could not remember, stated that he deals with so many customers during a period of time it was hard to say."  ECF Dkt. #96-17 at 1.  Consequently, it is not clear from the ECPD records that no one at Atlantic Gun and Tackle identified Bell, only that they could not remember seeing him.

### 8. Damage to the Buick 225 consistent with shooting and failure to conduct forensic examinations of paint scrappings

Petitioner contends that "the jury was told a Buick 225 was not considered to be involved in the shooting."  ECF Dkt. #13-15 at 69.  In fact, Petitioner's trial counsel asked Kalvitz, "On November 19, did you have information from anyone that the car that was involved in the shooting was something other than a white Oldsmobile?"  Kalvitz responded, "No."  Trial counsel asked, "From any source?"  Kalvitz responded, "To my knowledge I only am aware of the information provided by Ronald Greene when he was saying Olds Cutlass."  *Id.*  Petitioner's trial counsel then asked if Kalvitz was aware of interviews of people on the scene the night of the shooting, and Kalvitz responded that he was not at the scene.  Kalvitz testified, "I don't know if another officer received that information, I can't speak for them."  *Id.* at 70.

Gard and Ventura investigated the police report placing Henry Hayes' Buick 225 near the scene of the crime on November 14, 1990.  Petitioner has not offered any evidence to call into question Kalvitz' testimony at trial.

Petitioner further contends that the jury heard about significant damage to Triplett's Cadillac, including damage to the "right rear quarter panel and tailgate."  ECF Dkt. #13-14 at 87.  According to Petitioner,  "[n]ew evidence show the Buick 225 showed damage consistent with the shooting.  The impound form for Hayes' Buick 225 shows 'light' damage  to the left front quarter panel.  In contrast, the impound for Petitioner's Oldsmobile reports no damage and was described at in 'good condition.'"  This evidence is irrelevant because Greene testified at trial that Triplett's Cadillac and Petitioner's Oldsmobile did not collide.  ECF Dkt. #13-14 at 158.

### 9. Police credibility in doubt

Petitioner contends that ECPD police records reveal that several of the detectives assigned to the investigation of the shooting "also participated in prior unsuccessful cases against

[Petitioner]."  ECF Dkt. #104 at p. 71.  Petitioner's habeas counsel had the opportunity to depose Detectives Kalvitz and Johnson.  Having reviewed their deposition testimony in its entirety, the undersigned recommends that the Court find that  Petitioner has offered no evidence of bias on the part of either detective.

### 10.  Subsequent shootings of Greene's residence

Prior to voir dire, Petitioner's trial counsel informed the court about gunshots fired at Greene's residence on June 25,1991 at 3:00 a.m.  ECF Dkt. #13-12 at 204.  The State informed the court that a .380 pellet was recovered at the scene, however, the parties have stipulated that an ECPD report reveals that a .9 mm pellet was recovered at the scene.  Petitioner argues that despite the fact that the State knew that a .9 mm pellet, rather than a .380 pellet like the ones found at the scene of shooting at Shaw and Hayden, the State nonetheless argued before the trial court that Petitioner was responsible for the gunshots fired at Greene's residence.  ECF Dkt. 13-13 at 508. Because this evidence was never introduced at trial, it had no impact upon Petitioner's conviction.

### 11.  Failure to investigate potential eyewitnesses

Petitioner contends that ECPD ignored the information provided by Hobbes and Cooper regarding the suspect vehicle.  To the contrary, based upon the information provided by Hobbes and Cooper, ECPD detectives investigated Henry Hayes' possible involvement in the shooting. Hayes was arrested, however, Greene was unable to identify Hayes as the perpetrator.  In addition, Hayes  provided an alibi witness, and further investigation revealed that the Landau lights on Hayes' Buick were not operative.  Accordingly, the undersigned recommends that the Court find that the ECPD  properly investigated the eyewitness reports of Hobbes and Cooper.

### 12.  Collective effect of newly discovered evidence

Petitioner contends that, pursuant to *Schlup*, the collective effect of the newly discovered evidence demonstrates by a preponderance of the evidence that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. Petitioner further contends that, pursuant to subsection(a)(2)(ii) of §2244, the collective effect of the newly discovered evidence, viewed in light of the evidence as a whole, is sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found Petitioner guilty of the

-36-

underlying offense.  Petitioner's arguments overstate the value of the new evidence and understates the value  of the evidence offered at trial.

At the trial, Greene identified Petitioner as the man who shot him and killed Triplett.  At the trial, Harris testified that Petitioner confessed to shooting Greene at Triplett.  Neither Greene nor Harris has recanted their testimony.  Instead, Petitioner challenges the veracity of the trial testimony of Greene and Harris by way of the deposition testimony of Collins and Edwards.  As stated previously, Collins himself conceded that he could offer no proof that Greene  could not identify the man who shot him.  Furthermore, Collins' story did not include details that would lead a reasonable factfinder to credit his story.  Edwards' testimony also strained credulity.  She offered a handful of reasons why she initially provided a false witness statement, none of which were particularly compelling.  Finally, her demeanor at the deposition did not lend credibility to her story.          Petitioner further contends that ECPD failed to thoroughly investigate witness statements implicating alternative suspects, and that the state failed to disclose alternative suspects to Petitioner's trial counsel.  To the contrary, the only "alternative suspect" that warranted any investigation was Henry Hayes.  The witness statements of the two gas station attendants identified a Buick 225 as the suspect vehicle.  ECPD investigated Hayes (largely based upon the witness statements of Hobbes and Cooper), as well as the patrolman's  report, which placed Hayes' Buick at the scene of the crime.  After Hayes was questioned, and Greene was unable to identify him as the perpetrator, Hayes was no longer a suspect.  Petitioner has offered no additional evidence that implicates Hayes in the shooting.

Petitioner also argues that Greene's inconsistent description of the shooter, which was documented in ECPD police reports, constituted newly discovered evidence.  To the contrary, Petitioner's trial counsel vigorously cross-examined Greene with respect to his initial description of the perpetrator.  The jury heard testimony regarding Greene's incomplete description of the shooter, and, nonetheless, credited Greene's identification.  Because the ECPD reports add no new information regarding Greene's initial description of the perpetrator, they do not constitute newly discovered evidence.

Petitioner's remaining claims fall into two categories, evidence that was available at trial (Triplett and Greene's drug involvement, Harris' drug use, subsequent shootings at Greene's residence), and allegations that are not born out by the new evidence (police misconduct, damage to the Buick 225, no one could identify Petitioner at Atlantic Gun & Tackle).

In summary, Petitioner carries a heavy burden to establish a gateway claim of actual innocence.  Petitioner  must demonstrate the probability, not simply the possibility, that no reasonable juror would have  convicted him in light of all of the evidence before the Court.  Here, Petitioner has failed to meet his burden.  Petitioner caries an even heavier burden when bringing a second successive petition.  He must demonstrate by clear and convincing evidence, that a reasonable juror would not convict him based upon the new evidence, weighed with the evidence as a whole, but for the constitutional error.  In other words, Petitioner  must demonstrate the probability, not simply the possibility, that no reasonable juror would have  convicted him, but for the constitutional violations.  Here, even assuming that his constitutional claims are valid,  the new evidence is insufficient, when considered in light of the trial testimony of Greene and Harris, as well as the other strong evidence adduced at trial, to meet Petitioner's burden.  Accordingly, the undersigned recommends that this Court dismiss the petition based upon Petitioner's failure to establish clear and convincing evidence of actual innocence.

Assuming arguendo that the Court does not adopt the undersigned's conclusion regarding the evidence of "actual innocence," the undersigned will address the merits of the petition.

## VI.  ANALYSIS

Respondent contends that the petition was untimely filed.  Because the statute of limitations does not constitute a jurisdictional bar to habeas review, a federal court, can, in the interest of judicial economy, proceed to the merits of a habeas petition. See *Smith v. State of Ohio Dept. of Rehabilitation*, 463 F.3d 426, 429 n. 2 (6th Cir.2006) (quoting *Trussell v. Bowersox*, 447 F.3d 588, 590 (8th Cir.2006)). Respondent further contends that Petitioner's second and third claims are procedurally barred.  Like the statute of limitations, procedural default is not a jurisdictional limitation. *Pudelski v. Wilson*, 576 F.3d 595, 606 (6th Cir.2009)(citing *Cain v. Redman*, 947 F.2d 817, 820 (6th Cir.1991)), petition for cert. filed, 78 U.S.L.W. 3448 (U.S. Jan. 21, 2010) (No.

-38-

09-877). Because the limitations and procedural default issues in this case involve considerable analysis, and, as explained below, petitioner's claims are without merit, the undersigned recommends that the Court should deny the petition on the merits. See *Ahart v. Bradshaw*, 122 Fed. Appx. 188, 192 (6th Cir.2005).

### A.    GROUND ONE:

CHRISTOPHER BELL IS ENTITLED TO HABEAS RELIEF BECAUSE HE IS ACTUALLY INNOCENT OF MURDER AND ATTEMPTED MURDER. UNITED STATES CONSTITUTIONAL AMENDMENTS V, VIII, XIV.

Petitioner asserts "actual innocence" as a separate ground for relief. Petitioner, in his response to the amended answer and motion to dismiss, writes, "several federal circuit courts, including the Sixth Circuit of Appeals, have recognized that a freestanding actual innocence claim is cognizable." ECF Dkt. #17 at 14. In support of his contention, Petitioner cites *House v. Bell*, 311 F.3d 767 (6th Cir.2008). However, *House* was a death penalty case. To the contrary, the Supreme Court has long recognized, that in non-death penalty cases, "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400 (1993); see also *Collins* at 404 (claim of actual innocence is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise [procedurally] barred constitutional claim considered on the merits."). To the extent that Petitioner predicates Ground One solely upon his freestanding claim of actual innocence, the undersigned recommends that Ground One has no merit.

### B.    GROUND TWO:

CHRISTOPHER BELL IS ENTITLED TO HABEAS RELIEF BECAUSE HIS TRIAL ATTORNEYS WERE INEFFECTIVE. U.S. CONSTITUTIONAL AMENDMENTS VI AND XIV.

Petitioner contends that his trial counsel provided ineffective assistance of counsel, based upon his failure to call Ann Edwards and the gas station attendants, Hobbes and Cooper, at trial. The Sixth Amendment right to counsel and the right to effective assistance of counsel protect the fundamental right to a fair trial. See *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To establish the ineffective assistance of counsel, petitioner must show that:

-39-

(1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense. *Id.* at 687. These two components are mixed questions of law and fact. *Id.* at 698. Further, "[t]here is no reason for a court deciding an ineffective assistance claim ... to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, ... that course should be followed." *Id.*

With respect to the performance prong of the *Strickland* test, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *Id.* at 689; see also *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir.1994). "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Strickland*, 466 U.S. at 689 (citation omitted). "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690.

With respect to the prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. Petitioner carries the burden to establish the elements of his ineffective assistance of counsel claim. See *United States v. Pierce*, 63 F.3d 818, 833 (6th Cir.1995) (petitioner bears the burden of establishing counsel's ineffectiveness); *Lewis v. Alexander*, 11 F.3d 1349, 1352 (6th Cir.1993) (same).

The Supreme Court recently observed in *Harrington v. Richter*, *supra*:

"Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S.__,__, 130 S.Ct. 1473, 1485, 176 L.Ed.2d 284 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland*, 466 U.S., at 689–690, 104 S.Ct. 2052, 80 L.Ed.2d 674. Even under de novo review, the standard for judging counsel's representation is a most deferential one.  Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge.  It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id.*, at 689, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674; see also *Bell v. Cone*, 535 U.S. 685, 702, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d

-40-

180 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S., at 690, 104 S.Ct. 2052, 80 L.Ed.2d 674.

Establishing that a state court's application of *Strickland* was unreasonable under §2254(d) is all the more difficult. The standards created by S*trickland* and §2254(d) are both "highly deferential," id., at 689, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowle*s [*v. Mirzayance*, 556 U.S. 111, 123, 129 S.Ct. 1411, 173 L.Ed.2d 251 (2009) ] The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ___, 129 S.Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under §2254(d). When §2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

131 S.Ct. at 788.

In his brief, Petitioner writes, "Edward's testimony could have rebutted Harris' version of events." ECF Dkt. #104 at 53. However, as stated previously, Edwards testified that she was not present when Petitioner confessed to the crimes, not that Petitioner never confessed to the crimes. Furthermore, it is not clear from Edwards' deposition testimony that her testimony would have favored Petitioner. In other words, at the time of the trial, it is not clear whether Edwards would have testified that she heard Petitioner's confession, consistent with her witness statement, or that she did not hear Petitioner's confession. Even if Edwards had testified that she was not present when Petitioner confessed to the murders, her testimony would have been subject to impeachment, in that it would directly contradict her witness statement. Consequently, the undersigned recommends that trial counsel's failure to call Edwards at trial was not unreasonable under §2254(d).

Trial counsel's failure to call Hobbes and Cooper at trial should also survive the doubly deferential review announced in *Knowles, supra.* The testimony of Hobbes and Cooper was at odds with Greene's pronouncement immediately after the shooting that the suspect car was a white Cutlass. Moreover, the testimony of Hobbes and Cooper was also inconsistent. Hobbes saw a beige or creme Buick Electra 225, but no Landau lights. Cooper saw a beige or white full sized automobile with Landau lights on the passenger side. ECPD reports indicate that the Landau lights

-41-

on the passenger side of Henry Hayes' Buick did not function.  Due to the inconsistency of the foregoing testimony, the undersigned recommends that the Court find that trial counsel did not act unreasonably in failing to offer the testimony of Hobbes and Cooper at trial.

Having reviewed Edwards' deposition testimony and the witness reports given by Hobbes and Cooper, the undersigned recommends that Petitioner has failed to demonstrate that his trial counsel's failure to call those witnesses at trial constituted ineffective assistance of counsel Accordingly, the undersigned recommends that the Court find that Ground Two has no merit.

### C.    <u>GROUND THREE</u>:

CHRISTOPHER BELL IS ENTITLED TO HABEAS RELIEF BECAUSE THE PROSECUTION WITHHELD EXCULPATORY IMPEACHING EVIDENCE.

To establish a violation of the rule announced in *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), Petitioner must show that (1) the prosecution suppressed evidence, either willfully or inadvertently; (2) the evidence is favorable to the accused, either because it is exculpatory or because it is impeaching; and (3) the suppressed evidence is material to guilt or punishment.  *Moore v. Illinois*, 408 U.S. 786, 794–95, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972); see also *Strickler v. Greene*, 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir.2000).

The rule encompasses evidence "known only to police investigators and not to the prosecutor." *Kyles v. Whitley*, 514 U.S. 419, 438, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). In order to comply with *Brady*, therefore, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police." *Id.* at 437, 115 S.Ct. 1555, 131 L.Ed.2d 490.

Evidence is "material" within the meaning of *Brady* "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); see also *Strickler*, 527 U.S. at 280 (citing *Kyles, supra*). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome" of the trial. *Bagley*, 473 U.S. at 682. "The mere possibility that an item of undisclosed information might have helped the defense, or

might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs*, 427 U.S. 97, 109–10, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). This standard for determining materiality focuses on the defendant's guilt or innocence, rather than on the impact of the undisclosed evidence on the defendant's ability to prepare for trial. *United States v. Phillip*, 948 F.2d 241, 249 (6th Cir.1991) (citing *Agurs*, 427 U.S. at 112 n. 20).

"The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles* at 434.  When determining whether the withheld information was material and therefore prejudicial, the court must consider it in light of the evidence available for trial that supports the petitioner's conviction.  See *Towns v. Smith*, 395 F.3d 251, 260 (6th Cir.2005); *Clinkscale v. Carter*, 375 F.3d 430, 445 (6th Cir.2004).

To meet *Brady* criteria the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; the evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.  *Strickler* v. Greene, 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). Relevant to the parties' arguments here, "information withheld by the prosecution is not material unless the information consists of, or would lead directly to, evidence admissible at trial for either substantive or impeachment purposes." *U.S. v. Phillip*, 948 F.2d 241, 249–50 (6th Cir.1991). The petitioner must give the Court some basis to "conclud[e] that disclosure of this item would have led to the discovery of other admissible evidence" if the Brady material itself is inadmissible. *Hutchison v. Bell*, 303 F.3d 720, 743 (6th Cir.2002).

The Sixth Circuit has held that information about other suspects that "does not even indirectly link any of the suspects to the murder" is "simply too remote to have been exculpatory or to undermine confidence in the verdict." *Apanovitch v. Houk*, 466 F.3d 460, 484 (6th Cir.2006). To be considered material in a *Brady* analysis, there must be "direct or circumstantial evidence linking the third person to the actual perpetration of the crime." *Spirko v. Anderson*, No. 3:95CV7209, 2000 WL 1278383, at *7 (N.D.Ohio July 11, 2000); see *Jalowiec v. Bradshaw*, 657 F.3d 293, 312 (6th Cir.2011). Speculation is not enough. *Bagley*, 644 F.3d at 325.

Here, Petitioner points to various parts of the ECPD reports, that is, Greene's initial description of the suspect vehicle as a four-door Cutlass, Brooks' threats to Triplett after the break-up, and the various other "alternative suspects," and asserts that the foregoing information constitutes *Brady* material.  To the contrary, Greene's initial description of the car was the subject of cross-examination, and, therefore, withheld additional evidence of that description does not call into question the fairness of the trial.   Petitioner's remaining *Brady* claims are predicated upon alleged "alternative suspects" for which Petitioner offers no direct or circumstantial evidence linking them to the actual perpetration of the crime.  For instance, Brooks' threats were investigated by ECPD.  The reports reflect that the detectives interviewed Brooks, who provided alibi witnesses for the night of the shooting, which included a new boyfriend.  Likewise, ECPD thoroughly investigated Henry Hayes, who Greene was unable to identify from a photo array.

Because the Court must consider the new evidence in light of the evidence available for trial that supports the petitioner's conviction, see *Towns, supra,* (6th Cir.2005), the undersigned recommends that the Court find that the new evidence does not constitute exculpatory or impeaching evidence that should have been disclosed to Petitioner's trial counsel.

Petitioner also asserts a violation of *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) (internal citations omitted). The deliberate deception of a court and jurors by the presentation of known and false evidence is incompatible with the rudimentary demands of justice. *Giglio v. United States*, 405 U.S. 150, 153, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). There is also a denial of due process when the prosecutor allows false evidence or testimony to go uncorrected.  *Napue v. Illinois*, 360 U.S. at 269.

To prevail on a claim that a conviction was obtained by evidence that the government knew or should have known to be false, a defendant must show that the statements were actually false, that the statements were material, and that the prosecutor knew they were false. *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir.1998).  However, a habeas petitioner must show that a witness' statement was "indisputably false," rather than misleading, to establish a claim of prosecutorial misconduct or a denial of due process based on the knowing use of false or perjured testimony. *Byrd v. Collins*, 209 F.3d 486, 517-18 (6th Cir.2000).  The Supreme Court "has consistently held that a conviction

-44-

obtained by the knowing [or uncorrected] use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

Petitioner contends that "the State violated its constitutional duties by (1) failing to correct Kalvitz's false testimony that the ECPD only identified two possible suspects in the shooting; (2) failing to correct Kalvitz's false trial testimony that the ECPD had no information to suggest that Monique Brooks was suspected to be involved in any way with the shooting; and (3) failing to correct Greene's false testimony that he never told anyone the shooter's car had four doors." ECF Dkt. #104 at 37. Petitioner further contends that the State misrepresented facts surrounding the subsequent shooting of Greene's residence. Petitioner writes, "[a]t trial, the State falsely confirmed to the trial court that , on July 3, 1991, Greene's house was shot at while Greene was home, but that no pellets were recovered. Later at trial, the State falsely informed the court the pellet used in the subsequent shooting was a .380 pellet[.]" *Id.* at 41 (internal citations omitted). Petitioner further contends that "later at trial, and outside of the presence of the jury, the State informed the trail Court [sic] that pellets were recovered from the shooting of Greene's residence and a report comparing the pellets to those in the Shaw and Hayden shooting had been prepared. To date, the State denies the existence of this pellet comparison report." *Id.* at 42 (internal citations omitted).

First, Kalvitz's testimony that there were only two possible suspects is not actually false. The question, as it was posed to Kalvitz allowed Kalvitz to rely upon his own definition of the term "suspect." Evidently, Kalvitz interpreted the term strictly, that is, he considered Petitioner and Henry Hayes to be the only individuals who were seriously considered as possible suspects. The same rationale applies to Kalvitz's failure to identify Monique Brooks as a suspect. Although Gard and Ventura followed up on Allegra Triplett's story that her brother's break-up with Brooks involved violence and threats, Brooks was ruled out as a suspect after she provided an alibi. Because Kalvitz's testimony was not "indisputably false," see *Byrd, supra*, Petitioner cannot establish a *Napue* violation.

-45-

Next, Petitioner argues that Greene lied on cross-examination when he was asked whether he ever told anyone that the suspect car had four doors. Greene responded, "No." ECF Dkt .#13-14 at 187. Then, Greene was asked if he described the suspect vehicle as a white four-door Oldsmobile Cutlass when the police came to visit him in the hospital. Greene responded, "Not that I recall. . .As far as I remember I don't think I said it." *Id.* Later, Greene was asked, "Do you recall writing down answers to questions that you were asked by East Cleveland police? . . .Do you recall writing that it was a four door?" Greene responded, "No." *Id.* at 188.

Although Greene's testimony regarding his initial description of the suspect vehicle was false, the undersigned finds that the false statement was not material as required by *Napue*. There was testimony from both Greene and Kalvitz that confusion arose from Greene's comparison of the suspect vehicle to his friend's Oldsmobile, which had four doors. *Id.* at 186-187. Because the jury was aware that confusion existed with respect to the number of doors on the suspect vehicle, it is unlikely that the false statement was material in the sense that it influenced the jury's verdict. See *Agurs, supra.*

Finally, with respect to the evidence of the shootings at Greene's residence, that evidence is wholly irrelevant to Petitioner's conviction. The evidence itself was never admitted at trial, and, to the extent that it constitutes false evidence, it played no role in Petitioner's conviction.

Having considered Petitioner's argument regarding the evidence that was not disclosed to Petitioner's trial counsel, Kalvitz's deposition testimony and his testimony at trial, and Greene's testimony at trial, the undersigned recommends that Petitioner has failed to demonstrate the constitutional violations recognized in *Brady* and *Napue*. Accordingly, the undersigned recommends that the Court find that Ground Three has no merit.

## VII.    CONCLUSION

In order to properly support a second successive petition, a petitioner must, at a minimum, introduce clear and convincing credible new evidence that "thoroughly undermines the evidence supporting the jury's verdict." *Rivas*, 687 F.3d at 543, citing *House*, 547 U.S. at 553-54." Having considered all the evidence, old and new, incriminating and allegedly exculpatory, and, viewing the record as a whole, the undersigned cannot conclude that the jury would not have convicted

-46-

Petitioner, even assuming constitutional error. See *House* at 538.  Accordingly, based upon all of the evidence before the Court, the undersigned recommends that the Court find that Petitioner has failed to meet his burden to demonstrate "actual innocence" under §2244(a)(2)(B)(ii).  Furthermore, assuming arguendo that the Court does not adopt the undersigned's recommendation with respect to the "actual innocence" prong of §2244, the undersigned recommends that the Court find that Petitioner has failed to show that any constitutional error was committed at his trial.  For the foregoing reasons, the undersigned RECOMMENDS that the Court DISMISS the instant petition in its entirety with prejudice.


DATE: January 31, 2013                                  */s/ George J. Limbert*
                                                        GEORGE J. LIMBERT
                                                        UNITED STATES MAGISTRATE JUDGE


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice. Fed. R. Civ. P. 72; L.R. 72.3. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. L.R. 72.3(b).