# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTOPHER D. BELL, | ) | CASE NO.  1: 09 CV 1887 |
| | ) | |
| Petitioner, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| vs. | ) | |
| | ) | |
| TERRY A. TIBBALS, Warden, | ) | <u>Memorandum of Opinion and Order</u> |
| | ) | |
| Respondent. | ) | |

This case concerns convictions for murder and attempted murder that occurred over twenty years ago.  Before the Court is the Report and Recommendation of Magistrate Judge Limbert (Doc. 114) recommending that the Court dismiss petitioner's pending Petition for a Writ of *Habeas Corpus*.  Both respondent and petitioner have filed objections to the Report and Recommendation.  For the reasons stated below, the Court accepts the recommendation of the Magistrate Judge that the petition be dismissed.

**Standard of Review**

Pursuant to Fed. R. Civ. P. 72(b)(3), the district court reviews *de novo* "any part of [a] magistrate judge's disposition that has been properly objected to."  "The district judge may

1

accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." *Id*.

**Background**

Following a jury trial in the Cuyahoga County Court of Common Pleas in 1991, petitioner was convicted of murder with a firearm specification, attempted murder with a firearm specification, and two counts of receiving stolen property with violence specifications. One count of having a weapon under a disability was tried to the Court, and petitioner was convicted on that count as well. Petitioner was sentenced to consecutive terms of fifteen years to life imprisonment and ten to twenty-five years of imprisonment, two concurrent terms of three to ten years of imprisonment, one concurrent term of two to five years imprisonment, respectively, plus two consecutive terms of three years of imprisonment for the firearm specifications.

Petitioner appealed to the Ohio Court of Appeals, which rejected petitioner's challenges to his convictions (including his contention that he had wrongfully been denied access to police investigative records which prevented him from properly presenting a defense), but accepted petitioner's argument that the trial court erred by imposing two consecutive firearm sentences. The Ohio Court of Appeals affirmed all of petitioner's convictions on direct appeal, but vacated one of petitioner's consecutive three-year firearm specification sentences. *State v. Bell*, No. 62325, 1993 WL 146599 (Ohio App. May 6, 1993).

In its decision, the Ohio Court of Appeals found the following facts (which the Magistrate Judge has quoted *verbatim* in his Report and Recommendation).

Ronald Green testified that on November 14, 1990, at about one o'clock a.m., he was a passenger in an automobile driven by Vance Triplett. At the

2

intersection of Shaw Avenue and Hayden Avenue in East Cleveland, Ohio, while they waited at the traffic light, a white Oldsmobile with its bright lights on pulled behind their car. They had passed the white automobile earlier as they turned onto Shaw Avenue. The car pulled along the passenger side of their automobile.

The driver of the white Oldsmobile, who was later identified as appellant, Christopher Bell, stared at them and then rolled his window down. Green also rolled his window down. Bell then said "Y'all niggas got a problem or something." Green replied, "Do you." Bell then said, "Yea." and fired at them. The first shot hit Green in the face and more shots were fired. The white automobile drove off. Triplett got out of the car and fell on the grass. The last word Triplett said was "I am tired." Green recognized the driver of the white automobile because the automobile was three feet away from them and there were street lights at the intersection. Green described the driver of the automobile to the police as a light skinned guy with an Afro curl, wearing a black jacket and a black hat. He was unable to identify anyone from the first photo array shown to him at the hospital. He identified Bell in a subsequent photo array.

Officer Mark Trzcinski of the East Cleveland Police Department testified that he was the first officer on the scene of the shooting on Shaw Avenue on the morning of November 14, 1990. When he arrived, Green was conscious and the first words he uttered were "A white Olds Cutlass." He repeated these words several times. Officer Trzcinski found Triplett lying on the tree lawn in front of 13420 Shaw Avenue. He appeared to be dead. He found no weapons at the scene.

Officer Jeffery Hall of the East Cleveland Police Department testified that he arrived at the scene of the shooting at about 1:30 a.m. on November 14, 1990. He recovered eight spent .380 casings at the scene. He observed a Cadillac in front of 13517 Shaw Avenue and Vance Triplett in front of 13420 Shaw Avenue. He recovered a spent bullet from the passenger side floor board of the Cadillac.

Detective Robert Kalvitz of the East Cleveland Police Department testified that he went to Huron Road Hospital on the morning of November 14, 1990 to interview Ronald Green. Green gave him a description of the man who shot him.

On November 19, 1990 Detective Kalvitz showed Green a photo array and he was unable to identify anyone. On November 28, 1990 Kalvitz showed Green another photo array and he picked out Bell as the man who shot him and Triplett. Kalvitz showed him photographs of a white Cutlass Oldsmobile, a

3

black cap and a black leather jacket. He told Kalvitz that they looked similar to the ones he saw on the morning of the shooting. On December 4, 1990, Kalvitz showed Green another photo array consisting of five photographs. Green again picked out Bell as the driver of the white Oldsmobile and the man who shot him and Triplett.

Detective Kalvitz testified he went to 1820 Noble Road, on account of a telephone call to the station by one Monica Harris. Ms. Harris called the station to report that she had information regarding a suspect in a homicide. Kalvitz went to the apartment building in the company of another officer to speak to Ms. Harris. On arrival, they noticed a white Oldsmobile Cutlass in the parking lot of the building. Kalvitz remembered that the automobile involved in the killing of Triplett was similar to the one in the parking lot. Upon further investigation, he noticed that the steering column did not match. The license plate was registered to Perron Williamson, while the vehicle identification number matched an automobile reported stolen from Mansfield, Ohio.

Kalvitz testified that Ms. Harris informed them that Bell had indicated to her that he shot two people at the intersection of Hayden Avenue and Shaw Avenue. Kalvitz showed Ms. Harris a photograph of Bell whom she identified as the man who told her about the shooting. Kalvitz was directed to Ann Edwards' apartment by Ms. Harris.

Kalvitz went to Ann Edwards' apartment. Ms. Edwards came to meet Kalvitz and the other officers. She identified herself and informed them that Bell was in the apartment. Bell came out of the apartment and was placed under arrest after his rights were read to him. Kalvitz testified that when Bell was placed under arrest, he said, "Oh, you're trying to put the shooting from Hayden and Shaw on me." Kalvitz stated that Bell made the statement before he was informed of any shooting.

Kalvitz testified that Ann Edwards told the police she had information about the Hayden/Shaw shooting. She signed a waiver and consent to the search of her apartment. When asked if there were guns in the house, she brought out a duffle bag belonging to Bell. The bag contained a .12-gauge gun, a loaded .357 automatic, a Reuger revolver, a .380 magazine clip with ten live rounds, a box of shotgun shells, titles to automobiles, a screwdriver and other papers. She gave Kalvitz keys to two automobiles, a black leather jacket and a cap. Kalvitz discovered two welfare identification cards with Bell's picture inside the white Oldsmobile which belonged to Robert Stillwell of Mansfield.

Bell testified only at the suppression hearing. He denied making any statements regarding the shooting at Shaw and Hayden Avenues. He admitted living in the apartment with Ms. Edwards. He has lived there for about six

4

months. He kept some of his possessions in that apartment. At the time of his arrest, he did not have any other address. He admitted owning the white Oldsmobile Cutlass and the Pontiac Trans Am, which were discovered to be stolen vehicles. He admitted ownership of the duffel bag and its contents.

Monica Harris testified at trial that she was at Ms. Edwards' apartment on the night of November 13, 1990 with Bell and Ms. Edwards, drinking. Bell left the apartment sometime after midnight to purchase more beer. He returned about 60 minutes later with beer, guns and clothing. He had one shotgun, a revolver, an automatic handgun and two ammunition clips in a plastic bag. According to Ms. Harris, Bell appeared wild as he came into the apartment. He was wearing a black leather jacket and a black Raider's cap with his eyes bugged out real wide and his hair standing.

Bell told them that they would not believe what he had just done. He said, "he just shot two guys on the corner of Shaw and Hayden and he unloaded on them." He emptied one clip, reloaded and shot them, because they were following him.

He went to the store after the shooting. He asked Ms. Harris to keep his guns until he could get rid of them. She returned the guns to Bell after she found out about Triplett's death. Bell informed Ms. Harris that he had gotten rid of the automatic weapon.

She first mentioned the incident to her friend, Detective Patterson. When the officers came to her apartment, she told them that Bell did the shooting. She told them that Bell was in Edwards' apartment. She gave the officers a Florida license plate left in her apartment by Mr. Bell. The Florida license plate and the Pontiac Trans Am were identified by Robert Grossman as his plate and his Pontiac Trans Am, which was stolen on October 17, 1991.

Richard Turbok testified that he is a firearm examiner for the Ohio Bureau of Criminal Identification and Investigation. He examined and compared the eight spent .380 casings recovered from the scene of the shooting and the one .380 found in the Trans Am and another found in the victim's automobile, and concluded all ten cartridge casings were fired from the same weapon. He also compared the casings to the .380 magazine found in the duffel bag and concluded that they are of one similar design and could have been in the magazine.

The four bullets recovered from the body of Triplett and three others recovered at the scene of the shooting were all fired from the same weapon.

A nitrate test was conducted on the Cutlass and gunshot residues were found

on the left hand corner of the dashboard with a heavier concentration on the window ledge of the driver's side door.

John Barnes testified that he is the owner of the apartment building located at 1820 Noble Road, in the city of East Cleveland. Apartment Number 5, he testified, was rented to Ann Edwards. Bell did not seek his consent before living with Ann Edwards. He testified that Bell drove a white Cutlass and a black Trans Am or Camaro.

Sheila Roberts testified that she had known Bell for more than three years. She had seen Bell, during the months of September and November of 1990, drive a white Cutlass. She saw him with a nine millimeter automatic he referred to as his "new toy," in September of 1990. She also identified a photograph of a black Trans Am as being similar to the automobile Bell drove.

Anthony Baylor testified that he saw Bell on the evening of November 13, 1990 at Malaikah Gray's house. However, Baylor left the house at 11:30 p.m.

Bell's father, Arthur Bey, testified that he saw his son on the evening of November 13, 1990 at his daughter's birthday party. He left the house at 10:00 p.m. while Bell was still at the party.

Malaikah Gray testified that Bell was at her house for her birthday party on November 13, 1990. She testified that he slept at her house that night. She admitted that her brother drove a white Cutlass.

*State v. Bell*, 1993 WL 146599 at *1-4.

Petitioner appealed to the Ohio Supreme Court, which dismissed petitioner's appeal.

*State v. Bell*, 619 N.E.2d 698 (Ohio 1993) (table).  Petitioner then filed a petition in the trial court for post-conviction relief in 1996, which the trial court also denied.  The Ohio Court of Appeals affirmed this judgment on appeal, and petitioner's subsequent appeal to Ohio Supreme Court was dismissed.

Petitioner filed a petition for a writ of *habeas corpus* with this Court in 1999, asserting five claims for relief.  *Bell v. Mitchell*, 1: 99 CV 3166 (N.D. Ohio 1999).  This Court accepted the Report and Recommendation of Magistrate Judge Hemann and dismissed this petition in

6

2000 as barred by the statute of limitations.  The Sixth Circuit denied petitioner a certificate

of appealability.  *See Bell v. Mitchell*, No. 00-4437 (6th Cir. Apr. 17, 2001) (unpublished); *Bell

v. Mitchell*, No. 00-4437 (6th Cir. June 12, 2001) (unpublished).

In 2007, petitioner filed a motion for a new trial in the Cuyahoga County Court of

Common Pleas on the basis of new evidence petitioner obtained through *pro se* efforts from

jail, asserting prosecutorial misconduct.  Petitioner asserted that he was not able to obtain

relevant ECPD investigative reports and records regarding the 1990 shootings for which he

was convicted until 2006 and that these reports demonstrated his actual innocence.[1]  The state

trial court summarily denied petitioner's motion for a new trial on March 27, 2007, although

neither petitioner nor the state was made aware that the motion had been dismissed.

Petitioner filed a notice of appeal and motion to file a delayed appeal in the Ohio Court of

Appeals, but the Ohio Court of Appeals dismissed petitioner's appeal on December 20, 2007.

*State v. Bell*, No. CA-07-090777 (Ohio App. 8 Dist. Dec. 20, 2007).  On May 21, 2008, the

Ohio Supreme Court also denied petitioner's motion to file a delayed appeal.

In June 2008, petitioner sought leave from the Sixth Circuit Court of Appeals to file a

second, or successive, *habeas corpus* petition in this Court pursuant to 28 U.S.C. §2244(b)(2).

That statute provides:

(2) A claim presented in a second or successive habeas corpus application

---

[1]

Petitioner asserts (and respondent does not dispute) that police investigative reports
regarding the shootings were not turned over to him at the time of his trial.  Petitioner's trial
counsel filed a motion with the trial court for production of the police investigative files and
reports (which the State opposed), but the trial court denied petitioner's motion holding that
the Public Records Act then in effect did not permit disclosure of police investigative files.
Petitioner asserts (and respondent does not dispute) that he was not able to obtain the police
investigative reports regarding the shootings until 2006, through *pro se* efforts from prison.

7

under section 2254 that was not presented in a prior application shall be dismissed unless– . . .

(B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and

(ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. §2244(b)(2).

On June 16, 2009, the Sixth Circuit granted petitioner's "motion for an order authorizing the district court to consider a second or successive habeas corpus petition." *See In re: Christopher D. Bell*, Case No. 08-3831, slip op. at 3 (6th Cir. June 16, 2009). The Sixth Circuit stated that a *prima facie* showing under 28 U.S.C. §2244 "requires only sufficient allegations of fact together with some documentation that would warrant a fuller exploration in the district court" to "ascertain whether but for . . . constitutional error, no reasonable factfinder would have found [petitioner] guilty of the underlying offense." *Id.*, slip op. at 2-3. The Sixth Circuit found this standard satisfied, stating:

Essentially, the new evidence Bell cites are 1990 police reports that were withheld from the defense and which Bell was not able to obtain until November 2006. Most significantly, the reports show that a witness to the shooting in this case described the perpetrator's car as a beige or off-white Buick 225, rather than the white Oldsmobile Cutlass that Bell drove. In addition, the reports show that police located a parked vehicle matching the description, and that the vehicle contained a baseball hat matching one described by the surviving shooting victim in this case as being worn by the perpetrator. Further, police reports reflect that the murder victim [Triplett] had recently had a conflict with a former girlfriend, and that the former girlfriend may have threatened to order a "hit" on the victim. Although these police reports apparently were withheld from the defense, the defense was aware of both the Buick 225 and the victim's conflict with his ex-girlfriend, and while both subjects were explored to some extent by the defense at trial, the withheld police reports likely would have been of great value to the defense. Under

8

these circumstances, Bell's new evidence warrants further scrutiny in the district court.

*Id.*, slip ap. at 3.

Although the Sixth Circuit did not identify the specific police reports withheld from the defense, police reports petitioner submitted to the Sixth Circuit with his motion included the following: a police report dated November 14, 1990, indicating that East Cleveland police officers interviewed Tommy Hobbes, who witnessed the shooting from his job at a nearby gas station and who identified the perpetrator's car as a "1978 or 1979 Buick 225 beige or creme in color."  Another police report indicates that a second witness to the shooting working at the gas station, Rebecca Cooper, also identified the perpetrator's car as a full size beige or white car that "had Landau lights on the side of it."  Police reports indicate that the East Cleveland police had ticketed a beige vehicle matching the description given by Hobbes in the vicinity of the shooting on November 16, 1990, police officers observed that this vehicle contained a black Pittsburgh Pirates baseball cap matching the one described by Greene as worn by the perpetrator, and the police subsequently considered and arrested the owner of the vehicle, Henry Hayes of Shaker Heights, as a suspect in the case.  In addition, police reports indicate that the murder victim, Triplett, had an argument and altercation with a former girlfriend, Monique Brooks, who had slashed the tires on Triplett's car and whose males friends had threatened Triplett a few weeks before the shootings.

Petitioner filed his successive *habeas* petition with this Court as authorized by the Sixth Circuit on August 12, 2009.  (Doc. 1.)

### Discussion

Petitioner's pending petition asserts three grounds for relief.  The first ground asserts

9

that petitioner "is entitled to *habeas* relief because he is actually innocent of murder and attempted murder.  United States Constitution Amendments V, VIII, XIV."  The second ground asserts that petitioner's "trial lawyers were ineffective.  U.S. Constitutional Amendments VI and XIV."  The third ground asserts that "the prosecution withheld exculpatory impeaching evidence."  Through counsel, petitioner subsequently amended his petition to supplement his second and third grounds.  His amended petition states as to his second ground for relief:

> Petitioner was denied effective assistance of counsel during his trial as guaranteed by the Sixth and Fourteenth Amendments to the Constitution and *Strickland v. Washington*, 466 U.S. 668 (1984).  As a result of counsel's ineffectiveness, Petitioner was prejudiced.  The evidence of ineffective assistance of counsel includes:
>
> Failure to follow up on bullet analysis from attempted shooting of Green in June 1991;
>
> Failure to impeach witnesses including, but not limited to Ronald Greene and Monica Harris;
>
> Failure to impeach Detective Kavitz; [and]
>
> Failure to adequately investigate Petitioner's innocence.

(Am. Pet., Doc. 8.)

> The amended petition states as to the third ground asserted in the petition:
>
> The prosecutor failed to disclose favorable evidence to an accused in a criminal proceeding violates [sic] the Due Process Clause, that was material either to guilt or to sentencing.  *Brady v. Maryland*, 373 U.S. 87 (1963).  The Court has expanded the duty to disclose to include impeachment evidence.  *United States v. Bagley*, 473 U.S. 667, 676 (1985).  This evidence includes both substantive and impeachment evidence:
>
> Information identifying Vance Triplett's former girlfriend as a potential suspect in the murder/attempted murder, including, but not limited to reports from Kenneth Algee, Allegra Triplett, and Ronald Greene;

10

> Information relating to the Buick Electra 225 that was confiscated in relation to the murder/attempted murder, and which included a Pittsburgh Pirates baseball cap;
>
> Information relating to Ronald Greene's statements regarding the shooter that suggested the inaccuracy of his description;
>
> Information related to Ronald Greene's statements identifying the shooter[']s car that suggested the inaccuracy of his description;
>
> Information refuting police assertions that Bell claimed he was at Ann Edwards the day of the shooting, sick with pneumonia[.]
>
> The prosecution presented false evidence.  A prosecutor's presentation of evidence known to be false violates . . . the Fourteenth Amendment.  The same result occurs when prosecutors, although not soliciting false evidence, allow false evidence to go uncorrected.  *Giglio v. United States*, 405 U.S. 150, 153 (1972).  Prosecutors cannot create a materially false impression regarding the facts of the case or the credibility of a witness.  The knowing use of false testimony entitles the accused to a new trial "if there is any reasonable likelihood the false testimony could have affected the verdict."  *United States v. Agurs*, 427 U.S. 97, 103-04 (1976); *Napue v. Illinois*, 360 U.S. 264, 271 (1959).  The false evidence that was presented or was allowed to go uncorrected included:
>
> Information related to the existence of alternate suspects and alternate vehicles involved in the shooting.

(*Id.*)  Petitioner attached 56 new exhibits to his petition, 26 of which are ECPD records.

(Doc. No. 1.)


        The Magistrate Judge allowed discovery on the issue of whether, but for alleged

constitutional violations, no reasonable juror would have found petitioner guilty beyond a

reasonable doubt. The Magistrate Judge then allowed expansion of the record to include

numerous exhibits and deposition testimony.  (*See* Doc. Nos. 86, 87, 89, 90, 91, 93, 94, 96,

98, Joint Stipulations; 100, Order Expanding the Record.)  After discovery and lengthy

11

briefing by the parties, the Magistrate Judge issued his R&R recommending that the Court dismiss the petition.

Petitioner asserted in his briefs that he is entitled to *habeas* relief under 28 U.S.C. §2244(b)(2)(B)(i) and (ii). He asserted that he met his burden under 28 U.S.C. §2244(b)(2)(B)(i) in that new evidence he obtained through his *pro se* efforts from jail and in discovery could not have been previously discovered through the exercise of reasonable diligence. And he asserted that he satisfied the requirements of 28 U.S.C. §2244(b)(2)(B)(ii) in that he suffered due process and sixth amendment violations "such that, when viewed in light of the evidence as a whole, no reasonable factfinder would have found him guilty of the underlying offenses."

Respondent argued that petitioner's successive petition was barred by the one-year limitations period applicable in *habeas* actions (because petitioner did not file his successive petition within one year of the date he obtained the new evidence at issue) and that petitioner's grounds two and three were procedurally defaulted. Respondent also argued that petitioner's constitutional claims were insufficient on the merits. Petitioner disputed that his claims were time-barred and procedurally defaulted. He asserted that his claims were timely filed when the limitations period was properly tolled for the periods of time related to post-conviction proceedings. In addition, petitioner contended that he was entitled to equitable tolling on the ground that the evidence he obtained in 2006 establishes a credible claim of actual innocence. In *Souter v. Jones*, 395 F.3d 577 (6th Cir. 2005), the Sixth Circuit held that a credible claim of actual innocence will equitably toll the limitations period and allow consideration of an otherwise procedurally barred *habeas* petition. For purposes of equitable

tolling, a petitioner is required to show "that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt."  *Id*. at 602.

In the R&R, the Magistrate Judge did not specifically resolve whether petitioner's claims were timely filed or procedurally defaulted, stating that the "limitations and procedural default issues in [the] case involve considerable analysis."  (R&R at 39.)  Rather, the Magistrate Judge found that petitioner had not met his burden of demonstrating actual innocence under the standard for bringing a second or successive federal *habeas* petition under 28 U.S.C. §2244(b)(2)(B)(ii).[2]  The Magistrate Judge further found that petitioner did not demonstrate that any constitutional error was committed at his trial "[a]ssuming arguendo that the Court does not adopt [his] conclusion regarding the evidence of 'actual innocence'" under 28 U.S.C. §2244(b)(2)(B)(ii).  (R&R at 39, 47.)

The Magistrate Judge correctly stated the standard required to show actual innocence under 28 U.S.C. §2244(b)(2)(B)(ii).  The Magistrate Judge stated that under 28 U.S.C. §2244(b)(2)(B)(ii), the petitioner bore the heavy burden of demonstrating by clear and convincing evidence "that no reasonable factfinder would have found him guilty of murder and attempted murder, but for the alleged constitutional violations."  (R&R at 22.)  This is consistent with the plain language of the statute, which provides:  "A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application **shall be dismissed unless**– . . . (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and

─────────────

[2]

The Magistrate Judge acknowledged that petitioner satisfied the requirements of 28 U.S.C. §2244(b)(2)(B)(i).

convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. §2244(b)(2)(B)(ii) (emphasis added). The Tenth Circuit Court of Appeals recently found this to be the proper inquiry for the district court to undertake after a federal court of appeals has determined that fuller exploration of a *habeas* petition is warranted. The Tenth Circuit stated:

> If the court of appeals finds the applicant makes a prima facie showing that the applicant satisfies the requirements of [§2244(b)] . . . the applicant may pursue a claim in district court. The district court must then review the proffered evidence, and "shall dismiss any claim . . . that the court of appeals has authorized to be filed unless the applicant shows that the claim satisfies the requirements of [§2244(b)]."

*Case v. Hatch*, Case No. 11-2094, 2013 WL 675175, at *9 (10th Cir. Feb. 23, 2013) (internal citations omitted).

The Magistrate Judge addressed the new evidence petitioner asserted and found that, even if petitioner's alleged constitutional claims were valid, petitioner failed to demonstrate actual innocence under 28 U.S.C. §2244(b)(2)(B)(ii). The Magistrate Judge listed and discussed petitioner's asserted new evidence at length (*see* R&R at 23-36) and concluded that petitioner failed to meet the burden of demonstrating that but for the alleged constitutional violations, no reasonable jury would have found petitioner guilty on the basis of all of the evidence in the case "old and new, incriminating and allegedly exculpatory, and, viewing the record as a whole." (R&R at 46.) After considering petitioner's arguments and evidence, the Magistrate Judge found:

> Petitioner's arguments overstate the value of the new evidence and understates the evidence offered at trial.
>
> At trial, Greene identified Petitioner as the man who shot him and killed Triplett. At the trial, Harris testified that Petitioner confessed to shooting

14

Greene and Triplett.  Neither Greene nor Harris has recanted their testimony.
Instead, Petitioner challenges the veracity of the trial testimony of Greene and
Harris by way of the deposition of Collins and Edwards.[3]  As stated previously,
Collins himself conceded that he could offer no proof that Greene could not
include details that would lead a reasonable factfinder to credit his story.
Edwards' testimony also strained credulity.  She offered a handful of reasons
why she initially provided a false witness statement, none of which were
particularly compelling.  Finally, her demeanor at the deposition did not lend
credibility to her story.

Petitioner further contends that ECPD failed to thoroughly investigate witness
statements implicating alternative suspects, and that the state failed to disclose
alternative suspects to Petitioner's trial counsel.  To the contrary, the only
"alternative suspect" that warranted any investigation was Henry Hayes.  The
witness statements of the two gas station attendants identified a Buick 225 as
the suspect vehicle.  ECPD investigated Hayes (largely based upon the witness
statements of Hobbes and Cooper), as well as the patrolman's report, which
placed Hayes' Buick at the scene of the crime.  After Hayes was questioned,
and Greene was unable to identify him as the perpetrator, Hayes was no longer
a suspect.  Petitioner has offered no additional evidence that implicates Hayes
in the shooting.

Petitioner also argues that Greene's inconsistent description of the shooter,
which was documented in ECPD police reports,[4] constituted newly discovered
evidence.  To the contrary, Petitioner's trial counsel vigorously cross-
examined Greene with respect to his initial description of the perpetrator.  The
jury heard testimony regarding Greene's incomplete description of the shooter,

---

[3]

 As the Magistrate Judge discussed in the R&R, among the evidence petitioner relied
on in support of his petition was testimony obtained after petitioner's trial and conviction
from Randy Collins (who had been incarcerated with both petitioner and Greene) and Ann
Edwards.  Collins stated that Greene told him while the two were in jail that Greene did not
know who shot him.  Edwards stated that she was forced by the police to sign a witness
statement she provided to police stating that petitioner told her and Harris that he shot the
victims.  (There is no suggestion in petitioner's briefs that this evidence from Collins or
Edwards was unconstitutionally withheld from him at the time of his trial.)

[4]

 As discussed below, among the new evidence petitioner relies on in his petition and
contends the prosecution suppressed is a police report indicating that Greene initially
described the shooter's vehicle to police as a four-door car (which is inconsistent with
Greene's later identification of the shooter's vehicle as a two-door car).  As discussed below,
there was evidence at trial that Greene initially identified the shooter's car as a four-door car
and Greene was cross-examined at trial as to his identification of the shooter's car.

and, nonetheless, credited Greene's identification. Because the ECPD reports add no new information regarding Greene's initial description of the perpetrator, they do not constitute newly discovered evidence.

Petitioner's remaining claims fall into two categories, evidence that was available at trial (Triplett and Greene's drug involvement, Harris' drug use, subsequent shootings at Greene's residence), and allegations that are not born out by the new evidence (police misconduct, damage to the Buick 225, no one could identify Petitioner at Atlantic Gun & Tackle).

In summary, Petitioner carries a heavy burden to establish a gateway claim of actual innocence. Petitioner must demonstrate the probability, not simply the possibility, that no reasonable juror would have convicted him in light of all of the evidence before the Court. Here, Petitioner has failed to meet his burden. Petitioner carries an even heavier burden when bringing a second successive petition. He must demonstrate by clear and convincing evidence, that a reasonable juror would not convict him based upon the new evidence, weighed with the evidence as a whole, but for constitutional error. In other words, Petitioner must demonstrate the probability, not simply the possibility, that no reasonable juror would have convicted him, but for the constitutional violations. Here, even assuming that his constitutional claims are valid, the new evidence is insufficient, when considered in light of the trial testimony of Greene and Harris, as well as other strong evidence adduced at trial, to meet Petitioner's burden. Accordingly, the undersigned recommends that this Court dismiss the petition based upon Petitioner's failure to establish clear and convincing evidence of actual innocence.

(R&R at 37-38.)

The Magistrate Judge then proceeded to consider the merits of petitioner's asserted constitutional claims on the merits in the event this Court did not adopt his conclusion that petitioner failed to meet the burden under 28 U.S.C. §2244(b)(2)(B)(ii). The Magistrate Judge found that petitioner did not demonstrate any viable constitutional claim. The Magistrate Judge found that petitioner's first claim asserting "actual innocence" had "no merit" because a freestanding claim of actual innocence based on newly discovered evidence is not available in a non-death penalty case; therefore, petitioner's ground one "is not itself a constitutional claim," but instead, is a "gateway" through which a *habeas* petitioner must pass

16

to have otherwise procedurally barred claims considered on the merits.  (R&R at 39.)

The Magistrate Judge found that petitioner failed to demonstrate ineffective assistance of his trial counsel under *Strickland v. Washington*, 466 U.S. 668 (1984).  The Magistrate Judge stated, "Petitioner contends his trial counsel provided ineffective assistance of counsel, based upon his failure to call Ann Edwards and the gas station attendants, Hobbes and Cooper, at trial."  Finding that petitioner failed to demonstrate that his counsel was ineffective on this basis, the Magistrate Judge stated:

> In his brief, Petitioner writes, Edward's testimony could have rebutted Harris' version of events."  ECF Dkt. #104. at 53.  However, . . . Edwards testified that she was not present when Petitioner confessed to the crimes, not that Petitioner never confessed to the crimes.  Furthermore, it is not clear from Edwards' deposition testimony that her testimony would have favored Petitioner.  In other words, at the time of trial, it is not clear whether Edwards would have testified that she heard Petitioner's confession, consistent with her witness statement, or that she did not hear Petitioner's confession.  Even if Edwards had testified that she was not present when Petitioner confessed to the murders, her testimony would have been subject to impeachment, in that it would directly contradict her witness statement.  Consequently, the undersigned recommends that trial counsel's failure to call Edwards at trial was not unreasonable under §2254(d).

> Trial counsel's failure to call Hobbes and Cooper at trial should also survive the doubly deferential review announce in *Knowles*, *supra*.  The testimony of Hobbes and Cooper was at odds with Greene's pronouncement immediately after the shooting that the suspect car was a white Cutlass.  Moreover, the testimony of Hobbes and Cooper was also inconsistent.  Hobbes saw a beige or creme Buick Electra 225, but no Landau lights.  Cooper saw a beige or white full sized automobile with Landau lights on the passenger side.  ECPD reports indicate that the Landau lights on the passenger side of Henry Hayes' Buick did not function.  Due to the inconsistency of the foregoing testimony, the undersigned recommends that the Court find that trial counsel did not act unreasonably in failing to offer the testimony of Hobbes and Cooper at trial.

> Having reviewed Edwards' deposition testimony and the witness reports given by Hobbes and Cooper, the undersigned recommends that Petitioner has failed to demonstrate that his trial counsel's failure to call those witnesses at trial constituted ineffective assistance of counsel.  Accordingly, the undersigned

17

recommends that the Court find that Ground Two has no merit.

(R&R at 41-42.)

Finally, the Magistrate Judge found that petitioner failed to demonstrate constitutional violations under either *Brady v. Maryland*, 373 U.S. 83 (1963), or *Napue v. Illinois*, 360 U.S. 264 (1959).  The Magistrate Judge found that the prosecution's failure to disclose investigative police reports to the petitioner did not establish a *Brady* violation, stating:

> Here, Petitioner points to various parts of the ECPD reports, that is, Greene's initial description of the suspect vehicle as a four-door Cutlass, Brooks' threats to Triplett after the breakup, and the various other "alternative suspects," and asserts that the foregoing information constitutes *Brady* material.  To the contrary, Greene's initial description of the car was the subject of cross-examination, and, therefore, withheld additional evidence of that description does not call into question the fairness of the trial.  Petitioner's remaining *Brady* claims are predicated upon alleged "alternative suspects" for which Petitioner offers no direct or circumstantial evidence linking them to the actual perpetration of the crime.  For instance, Brooks' threats were investigated by ECPD.  The reports reflect that the detectives interviewed Brooks, who provided alibi witnesses for the night of the shooting, which included a new boyfriend.  Likewise, ECPD thoroughly investigated Henry Hayes, who Greene was unable to identify from a photo array.

(R&R at 44.)

The Magistrate Judge found that none of the bases asserted by petitioner were sufficient to establish a due process violation under *Napue*.  Petitioner asserted that the prosecution violated *Napue* by: (1) failing to correct trial testimony given by Officer Kalvitz that the ECPD identified only two possible suspects in the shootings (petitioner and Henry Hayes); (2) failing to correct trial testimony by Greene that he never told anyone the shooter's car had four doors; and (3) by allegedly making false statements to the trial court outside of the presence of the jury regarding a shooting that took place at Greene's home after petitioner was incarcerated.  (Petitioner contended that bullets from a shooting that took place at

18

Greene's home after he was incarcerated were similar to those used in the shootings for which

he was convicted.)  The Magistrate Judge rejected petitioner's contentions, stating:

> First, Kalvitz's testimony that there were only two possible suspects is not
> actually false.  The question, as it was posed to Kalvitz allowed Kalvitz to rely
> upon his own definition of the term "suspect."  Evidently, Kalvitz interpreted
> the term strictly, that is, he considered Petitioner and Henry Hayes to be the
> only individuals who were seriously considered as possible suspects . . . .
> Next, Petitioner argues that Greene lied on cross-examination when he was
> asked whether he ever told anyone that the suspect car had four doors. [Greene
> responded that he did not think he said that.]
>
> Although Greene's testimony regarding his initial description of the suspect
> vehicle was false, the undersigned finds that the false statement was not
> material as required by *Napue*.  There was testimony from both Greene and
> Kalvitz that confusion arose . . . as to the number of doors on the suspect
> vehicle, [thus,] it is unlikely that the false statement was material in the sense
> that it influenced the jury's verdict.
>
> Finally, with respect to the evidence of the shootings at Greene's residence,
> that evidence is wholly irrelevant to Petitioner's conviction.  The evidence was
> never admitted at trial, and, to the extent that it constitutes false evidence, it
> played no role in Petitioner's conviction.

(R&R at 45-46.)

Petitioner has filed a lengthy objection (Doc. 117), objecting to virtually every factual

and legal finding and determination made by the Magistrate Judge in his R&R.  Overall,

petitioner objects to:  the Magistrate Judge's "failure to find" his petition timely filed; (Pet.

Obj. at 3-8); the Magistrate's Judge's determination that he did not satisfy the standard for

demonstrating actual innocence under 28 U.S.C. §2244(b)(2)(B)(ii) (*id.* at 10-33); and the

Magistrate Judge's determination that he failed to demonstrate constitutionally valid claims

for ineffective assistance of counsel and prosecutorial misconduct as asserted in grounds two

19

and three of his petition (*id.* at 44-51).[5]

The Court does not find petitioner's objections to the R&R to have merit.  The Court does not find that the Magistrate Judge erred in failing to specifically address the statute of limitations given that the Magistrate Judge did not recommend dismissing the petition on that basis or on the basis of procedural default, and this Court does not find that petitioner's successive petition should be dismissed on either of those bases.

Further, upon review, this Court agrees with the Magistrate Judge that petitioner has failed to satisfy the burden required to file a second or successive *habeas* petition under 28 U.S.C. §2244(b)(2)(B)(ii), even assuming that a constitutional violation occurred under *Brady v. Maryland*, 373 U.S. 83 (1963).[6]   The Court's inquiry under 28 U.S.C. §2244(b)(2)(B)(ii)

---

[5]

Respondent has also filed an "objection" to the R&R (Doc. 116), but respondent's objection merely seeks to correct an obviously incorrect reference to a witness on page 29 of the R&R.  Specifically, in the last paragraph on page 29, the R&R refers to "Hayes' trial testimony that Edwards was present when Petitioner confessed to the crimes."  (R&R at 29.) Respondent points out that Hayes did not testify at trial; rather, the witness who gave the referenced testimony was Monica Harris.  Respondent's "objection" seeking to correct the reference is duly noted but does not require that the Court reject or modify any substantive determination made in the R&R.

[6]

*Brady* held "that the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  *Id.* at 87.  A *Brady* violation exists where:  (1) the prosecution suppressed evidence, either willfully or inadvertently; (2) the evidence is favorable to the accused, either because it is exculpatory or because it is impeaching; and (3) the suppressed evidence is material to guilt or punishment. *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000).  For purposes of the Court's analysis under 28 U.S.C. §2244(b)(2)(B)(ii), the Court will assume that the police reports petitioner discovered in 2006 are favorable to him and material under this standard.

However, the Court will not assume any other constitutional violations.  Rather, the Court agrees with and accepts the determinations of the Magistrate Judge that petitioner has failed to demonstrate viable constitutional claims for ineffective assistance of counsel and for violating *Napue*.  Under *Napue*, the "knowing use of false or perjured testimony constitutes a denial of due process if there is any reasonable likelihood that the false testimony could have

requires that the Court consider the body of evidence presented at trial, "add back" the

evidence kept from the jury as the result of constitutional error, and then determine whether

the evidence "is clear and convincing, in light of the evidence as a whole, that no reasonable

factfinder would have found [petitioner] guilty" but for the violation.  *See Case v. Hatch*,

2013 WL 675175, at * 20 (internal quotations omitted).  The Court's task in this regard is "to

look to the evidence the jury heard at trial, augmented by [the] evidence [linked to the

constitutional violations] and then make a probabilistic determination about what reasonable,

properly instructed jurors would do."  *Id*., citing *House v. Bell*, 547 U.S. 518, 538 (2006).

The Court's function is not to make an independent factual determination about what likely

occurred, but rather to assess the likely impact of the evidence on reasonable jurors."  *Id*.

The Magistrate Judge found that petitioner failed to meet the required burden under 28

U.S.C. §2244(b)(2)(B)(ii) essentially because there was significant evidence presented against

petitioner at trial (in particular, Greene's testimony identifying petitioner as the shooter and

Harris's testimony that petitioner confessed to her that he shot the victims), and the

Magistrate Judge did not find the newly discovered police investigative reports on which

───────────────

affected the judgment of the jury." *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir.1998).  To succeed
on such a claim, a defendant "must show (1) the statement was actually false; (2) the
statement was material; and (3) the prosecution knew it was false."  *Id*.  The Court agrees
with the Magistrate Judge that petitioner has not demonstrated that the prosecution knowingly
used false or perjured testimony.

Further, the Court agrees with the determination of the Magistrate Judge that
petitioner's trial counsel was not constitutionally ineffective.  The Magistrate Judge correctly
observed that the standard for judging counsel's representation under *Strickland* is "a most
deferential one." *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011).  The petitioner must show
that his counsel made errors at trial "so serious that counsel was not functioning as the
'counsel' guaranteed by the Sixth Amendment" and that "but for" such unprofessional errors
"the result of the proceeding would have been different."  *Id*. at 787.  The Court agrees with
the Magistrate Judge that petitioner's counsel's conduct did not violate this standard.

petitioner relies in his present petition (and which petitioner claims were unconstitutionally withheld from him) sufficient to demonstrate a probability that no reasonable juror would have convicted him in light of the whole body of evidence, old and new. In particular, the Magistrate Judge did not find the suppressed police reports regarding Henry Hayes sufficient to meet the burden required under 28 U.S.C. §2244(b)(2)(B)(ii), noting that the "ECPD investigated Hayes" based on the witness statements of Hobbes and Cooper and the ECPD patrolmen's report indicating that Hayes' car was ticketed in the vicinity of the shootings and contained a black Pittsburgh Pirates cap. The Magistrate Judge emphasized that the police ultimately concluded that Hayes was not a suspect in the shootings and found that petitioner's asserted new evidence did not implicate or link Hayes to the actual shootings.[7]

The Magistrate Judge also did not find the suppressed police report on which petitioner relies indicating that Greene initially identified the shooter's car to police as a four-door vehicle sufficient to meet petitioner's burden, finding that this report did not constitute new evidence because the jury heard evidence at trial regarding Greene's initial description of the shooter's car as a four-door vehicle. The Magistrate Judge stressed that Greene was extensively cross-examined at trial. (*See* R&R at 37-38.)

This Court agrees with the determination of the Magistrate Judge that, in the context of the whole body of evidence, the new evidence on which petitioner relies does not constitute clear and convincing evidence that but for constitutional *Brady* error, no reasonable

---

[7]

In contrast, as discussed above, there was significant evidence at trial linking petitioner to the actual shootings, including evidence that petitioner confessed to shooting the victims to Harris and firearms evidence linking petitioner to the guns and ammunition used in the shootings.

22

jury would have found petitioner guilty of the underlying offenses.  As the Magistrate Judge found, there was significant evidence presented against petitioner at trial.  In particular, this Court finds the following evidence significant and representative of the body of the trial evidence.  The victim Greene (who testified at trial and was subjected to cross examination) identified petitioner two separate times as the perpetrator from photo arrays, first on November 19, 1990, and then again on November 28, 1990.  Monica Harris testified at trial that petitioner confessed to the shootings to her on the night in question.  In addition, the first police officer to arrive at the scene testified that Greene's first words after being shot in the face were:  "A white Olds Cutlass," a description that matched petitioner's car and which Greene repeated several times at the scene.  Greene described the perpetrator to police as a light skinned man with an Afro curl and stated at the scene that the perpetrator was wearing a black leather jacket and a black hat.  A black leather jacket and cap were subsequently located by the police at the apartment where petitioner lived and were identified as belonging to petitioner.  Further, when the police arrested petitioner at this apartment, petitioner stated, even before he was informed of any shooting, "Oh, you're trying to put to the shooting on Hayden and Shaw on me."  A duffel bag belonging to petitioner was located at the apartment that contained various guns and ammunition, including:  a .12 gauge gun, a loaded .357 automatic, a Reuger revolver, a .380 magazine clip with ten live rounds, and a box of shotgun shells.  The apartment also contained keys to two automobiles that petitioner admitted to owning, including a white Oldsmobile Cutlass and a Pontiac Trans Am.

Firearms evidence presented at trial also linked petitioner to the shootings.  There was evidence that eight spent .380 casings were recovered from the scene of the shootings, one

spent .380 casing was found in the victim's car, and one spent .380 casing was found in petitioner's Trans Am.  A firearm's examiner testified that all ten of the recovered cartridge casings were fired from the same weapon and that the casings were of similar design as the .380 magazine found in petitioner's duffel bag and could have been used in petitioner's magazine.  Gunshot residues were found on the dashboard of petitioner's Oldsmobile Cutlass with a heavier concentration on the window ledge of the driver's side door (which is consistent with the location of the shooter whose vehicle was pulled alongside of the passenger side of the victim's vehicle when the victims were shot).

The new reports petitioner relies on in support of his petition that are to be "added back" to this body of trial evidence include an ECPD report dated November 14, 1990, indicating that Greene initially told the police that the shooter was driving a white four-door Cutlass.  Petitioner contends this was critical to his ability to fully impeach Greene at trial as to Greene's identification of the shooter and the shooter's car and pointed out that Greene's testimony was the main evidence at trial used to establish the identity of the shooter.

Petitioner's new evidence also includes police reports and witness statements pertaining to other suspects in the shootings, in particular Henry Hayes and Monique Brooks.  As to these alternative suspects, petitioner relies on the following new reports and records.  A suppressed ECPD report dated November 14, 1990, states that the murder victim's father, Kenneth Algee, called police and reported that Triplett had been dating a girl named Monique Brooks with whom he had a falling out.  The report indicates that Brooks had gone to Triplett's home, slashed his tires, and threatened Triplett.  Another suppressed police report, dated November 15, 1990, indicates that Brooks threatened to "hit" Triplett.  A suppressed

24

report dated November 16, 1990, states that police questioned Greene about Brooks and that Greene told police that Brooks had "put some boys on" him and Triplett and previously tried to shoot them.  He also said that he and Triplett had seen Brooks at the skating rink the night before the shooting and that Brooks had threatened them.

Regarding Hayes, petitioner relies on new police reports indicating that the ECPD ticketed a 1991 four-door Buick illegally parked in the vicinity of the shootings on November 16, 1990, and that the ticketing officer noted that the car matched the description of the shooter's car (*i.e.*, a white or beige four-door Buick) that was given to police by witness Tommy Hobbes.  The ticketing officer also noted that the car contained a "Pirates" cap in the back seat, which was consistent with statements Greene made to police (and at trial) that he thought the shooter was wearing a Pittsburgh Pirates cap.  The ECPD issued a police report on November 14, 1990 that was also not provided to petitioner that stated:

> BE ON THE LOOK OUT FOR A 1978-79 BUICK 225 ELECTRA 4DOOR BEIGE OR CREAM IN COLOR UNK LIC/PLATE . . . SUSPECT MALE WAS WEARING A PIRATE BASEBALL CAP.  WEAPON USED WAS A .380 AUTOMATIC.

Subsequent suppressed police reports indicate that the police located Hayes and investigated him as a suspect in the shootings but subsequently released him.  The suppressed reports indicate that Hayes initially lied to the police about whether he owned the ticketed vehicle and about the vehicle's whereabouts on the night in question.  Police determined that Hayes, in fact, was at his girlfriend's apartment located next door to the shootings on the night of the shootings.  Hayes denied to police that he owned a Pittsburgh Pirates cap and his girlfriend, Rita Jackson, told the police that she did not know about the shootings until the next morning because she and Hayes were "upstairs and she sleeps with the radio on."  The

25

police ultimately released Hayes as a suspect but informed him that his car matched a witness's description of the car involved in the shootings.  In his brief in support of his petition, petitioner points to testimony of his trial counsel, who stated that he did not see the ECPD reports regarding Hayes and certainly would have used the suppressed information to show the jury that Hayes was not just a possible alternate suspect in the case – he was "arguably the prime suspect who the police didn't handle properly."

The Court, however, does not find petitioner's new evidence sufficient, when "viewed in light of the evidence as a whole," to "establish by clear and convincing evidence" that no reasonable jury would have convicted petitioner had the suppressed police reports been disclosed to petitioner at the time of his trial and agrees with the determination of the Magistrate Judge in this regard.  The Court agrees that the suppressed police report regarding Greene's initial identification of the perpetrator's vehicle as a four-door Cutlass is insufficient to meet petitioner's burden as petitioner had other evidence at trial that Greene initially identified the shooter's car as a four-door Cutlass and petitioner was able to cross-examine Greene.  The Court notes that Greene consistently identified the shooter's car as a white Oldsmobile Cutlass.  The Court does not find that the suppressed report would have significantly affected or enhanced petitioner's ability to cross-examine or impeach Greene.

The Court also agrees with the determination of the Magistrate Judge that the suppressed police reports on which petitioner relies pertaining to other potential suspects in the shootings do not establish by clear and convincing evidence that no reasonable jury would have found petitioner guilty of the underlying crimes in the context of all of the evidence in the case.  As discussed above, suppressed police reports show that the ECPD found and

26

ticketed Hayes's car illegally parked in the vicinity of the shootings shortly after the shootings occurred; Hayes's car matched Hobbes's and Cooper's descriptions of the shooter's car as being a "full-sized" beige or white car; and an ECPD officer reported that he saw the same type of hat described by Green as worn by the shooter in Hayes's car.  However, as the Magistrate Judge correctly found, the suppressed police reports do not contain evidence linking Hayes to the shootings themselves.  In contrast, evidence presented at trial linked petitioner to the actual shootings.  Further, as the Magistrate Judge noted, Hobbes and Cooper gave inconsistent descriptions of the shooter's car such that Hobbes's and Cooper's descriptions do not definitively demonstrate that Hayes's car was the shooter's car.  That is, Hobbes saw a beige or creme Buick Electra 225 but no Landau lights; Cooper saw a beige or white full sized car with Landau lights on the passenger side.  Police reports, however, indicated that the Landau lights on the passenger side of Hayes's car did not function.

Petitioner's new evidence indicates that the ECPD patrolman who ticketed Hayes's car near the scene of the shootings noted that Hayes's car contained a black Pittsburgh Pirates cap.  But the evidence at trial also demonstrated that a black cap was found at petitioner's apartment.  The evidence at trial further demonstrated that, in addition to a black cap, the following evidence was found at petitioner's apartment: a black leather jacket (consistent with the jacket described by Greene as being worn by the shooter); guns and ammunition belonging to petitioner (consistent with those used in the shootings); and a white Oldsmobile Cutlass belonging to petitioner (which was the kind of vehicle Greene identified immediately after the shootings and consistently identified thereafter as the kind of car the shooter drove).

The suppressed police reports as to Monique Brooks likewise do not link Brooks, or

27

any other third party operating at Brooks's direction, to the shootings themselves. Given all of the evidence discussed above that was presented at trial implicating petitioner in the shootings, and the fact that the new evidence on which petitioner relies does not tie or link Hayes, Brooks, or any other third party or possible suspect to the shootings themselves, the Court does not find that the suppressed police reports are sufficient to demonstrate by clear and convincing evidence that no reasonable juror would have convicted petitioner had all of the suppressed reports been available to petitioner at the time of his trial.

This Court agrees with the determination of the Magistrate Judge that the new evidence on which petitioner relies is insufficient to satisfy the high burden required to file a second or successive *habeas* petition under 28 U.S.C. §2244(b)(2)(B)(ii), even if the Court assumes that constitutional error occurred at petitioner's trial and that all of the suppressed police reports regarding the 1990 shootings should have been disclosed to petitioner under *Brady*. The Court does not find that petitioner's new evidence, when viewed in light of the evidence as a whole, "would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found petitioner guilty of the underlying [crimes]." *Id.*

**Conclusion**

For all of the reasons stated above, the Court accepts the recommendation of Magistrate Judge Limbert that the pending petition for a writ of *habeas corpus* fails to satisfy the standard for filing a second or successive *habeas* petition under 28 U.S.C. §2244(b)(2)(B)(ii). Accordingly, for the reasons stated above and those stated by the Magistrate Judge, petitioner's second petition for a writ of *habeas corpus* is hereby dismissed.

IT IS SO ORDERED.

         /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated: 3/26/13